Renard G. DAVIS et al., Appellants,

v.

Richard H. ICHORD et al., Appellees.

Quentin YOUNG, Appellant,

v.

Richard H. ICHORD et al., Appellees.

Nos. 23426, 23427.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 13, 1970.

Decided Aug. 20, 1970.

Leventhal, Circuit Judge, concurred and filed opinion.

Miss Nancy Stearns, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, and Mr. Jeremiah S. Gutman, New York City, with whom Messrs. Morton Stavis, Newark, N. J., Sanford Katz, William M. Kunstler, New York City, and Philip J. Hirschkop, Alexandria, Va., were on the brief, for appellants.

Mr. Robert L. Keuch, Atty., Department of Justice, for appellees. Asst. Atty. Gen. J. Walter Yeagley, Mr. Kevin T. Maroney, and Mrs. Lee B. Anderson, Attys., Department of Justice, were on the brief, for appellees.

Before FAHY, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

FAHY, Senior Circuit Judge:

This is a consolidated appeal from an order of the District Court dismissing an action by appellants suing in behalf of themselves and all others similarly situated, in which they challenge the constitutionality of Rule XI of the House of Representatives. This Rule is the mandate or authorizing resolution of the present House Committee on Internal Security, as it was before amendment the mandate of the former House Committee on Un-American Activities. Appellants seek both declaratory and injunctive relief. Defendants in the District Court were members of the Committee on Un-American Activities. Appellees, usually referred to in this opinion as the Committee, are members of the House Committee on Internal Security.[1]

---

1. Two of originally named defendants, Willis and Tuck, are no longer members of Congress; another two, Culver and Clawson, while still members of Congress, are no longer members of the Committee.

When the cases were appealed to this court No. 23,426 was entitled Renard G. Davis et al., appellants v. Edwin E. Willis et al., appellees, and No. 23,427 was entitled Quentin Young, appellant v. Edwin E. Willis et al., appellees. The attention of the parties was called to the apparent inaccuracy of these entitlements in light of the pleadings on file. Appellants by counsel thereupon filed a Motion To Correct Caption by substituting under Rule 25(d) (1), Fed.R.Civ.P., certain of the defendants-appellees to read as follows:

Richard H. Ichord, John M. Ashbrook, Edwin W. Edwards, 'Claude Pepper, Richardson Preyer, Richard L. Roudebush, William J. Scherle, Louis Stokes and Albert W. Watson, as Chairman and Members of the House Committee on Internal Security, Defendants-Appellees.

We have made the change in caption and the above substitutions requested in the motion. Government counsel, representing the defendants originally named, expressed their acquiescence in the filing in the District Court of the Supplemental Complaint alleging the changed circumstances which had occurred since the original complaint was filed. These changes included the creation of the Committee on Internal Security, its relationship to the Committee on Un-American Activities, and changes in Committee membership. The acquiescence referred to, noted by the District Court in its

## I.

Appellants have been engaged actively in various political and civil rights causes. They were subpoenaed to appear before the House Committee on Un-American Activities during the week of October 1, 1968 to testify about disturbances in Chicago during the Democratic National Convention held in August of that year. They filed their original complaint on October 1, 1968.[2] They sought the convening of a three-judge court and a judgment declaring that Rule XI[3] and the resolution authorizing the threatened investigation[4] were overly broad and vague on their face and that the purpose of the forthcoming investigation would be to intimidate appellants from exercising their freedom of expression and association protected by the First Amendment.[5] Pending a ruling on their request for a permanent injunction against future operations and enforcement of the mandate and resolution, including the sealing of Committee records pertaining to them, appellants asked for

order of May 21, 1969, followed by Government counsel's appearances filed in this court for defendants-appellees, while not precluding any contention available on the merits due to the changes referred to, we construe as having been acquiescence in substitution, in their respective official capacities, of the members of the Committee on Internal Security as parties represented by Government counsel who filed appearances for "defendants-appellees."

2. Appellant Quentin Young filed a separate complaint on October 2, 1968 which was consolidated with that of the other six appellants by order of the District Court of October 11, 1968.

3. Rule XI, in part, provided that:
The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.
The Legislative Reorganization Act of 1946, 60 Stat. 812, insofar as it incorporates Rule XI and the resolution adopted September 12, 1968 authorizing this investigation into the Chicago riots, was similarly challenged.

4. This resolution provided in part that an investigation should be conducted:
relating to the extent, character and objective of communist propaganda, foreign or domestic, and communist activities within the United States to advance the objectives and purposes of the world communist movement and in aid of foreign communist governments and organizations, with particular reference to determining the extent to which and the manner in which, the incidents and acts of force and violence which occurred in the city of Chicago, Illinois, during the week of August 25, 1968, were planned, instigated, incited or supported by communist and other subversive organizations and individuals, and all other questions in relation to the above, which will provide factual information to aid the Congress in the proposal, consideration of, or the enactment of any necessary remedial legislation in fulfillment of the authority and directives contained in Rule XI, paragraph 18, of the House of Representatives Resolution 7, 90th Congress.

5. The complaint further claimed that the Committee's investigation would prejudice appellants' rights with respect to criminal proceedings pending in Chicago at that time; that the mandate and resolution constituted a Bill of Attainder in violation of Article I, Sec. 9, Cl. 3; that it would violate the principle of separation of powers; and that it infringed upon in other respects their First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, and Fifteenth Amendment rights. It was also alleged that the impending compulsory investigation would have no legislative purpose and that criminal proceedings to enforce the outstanding subpoenas would be instituted in bad faith, and without hope of ultimate success. The threat of the impending investigation and criminal proceedings was said by appellants to give rise to an irreparable injury in the form of a chill on their First Amendment freedoms, requiring injunctive relief.

an interlocutory injunction restraining the enforcement of the subpoenas through criminal proceedings.

After oral arguments the District Court on October 11, 1968 dismissed the application for a three-judge court,[6] and on October 29, 1968 granted a motion to dismiss the consolidated actions.[7] The rulings were consolidated on appeal to this court. At the request of appellants, however, the cases were remanded to the District Court for further proceedings "in light of the changed circumstances subsequent to the filing of the notices of appeal." Five of the appellants [8] had appeared and testified before the Committee. The other two [9] were not called to testify. Further, the 90th Congress expired on January 3, 1969 without having cited any appellant for contempt. Its power to do so terminated. Moreover, House Resolution 89 of the 91st Congress by an amendment to Rule XI abolished the Committee on Un-American Activities and created in its place the present Committee on Internal Security,[10] to which the records of the former Committee were transferred.

On the remand appellants were permitted to file a Supplemental Complaint in which they challenged the mandate of the new Committee as contained in amended Rule XI on the same constitutional grounds as they had challenged its predecessor. The Supplemental Complaint also charged that the Committee on Internal Security maintained files of the personal and political activities of thousands of individuals and hundreds of organizations which constitute a "political blacklist." The Complaint alleges that the dossiers are made available, as allegedly they have been in the past, to Federal, State, and Local Governments as well as private groups, to discriminate against citizens in employment and otherwise to harass them and deter them in the exercise of their constitutional rights, and that the names and derogatory information and false charges respecting appellants are in the dossiers. It is then alleged that "accordingly" appellants are immediately and irreparably injured by the use and threat of use of this blacklist against them, in violation of their First Amendment and other

6. The District Court correctly ruled that Rule XI was not an "Act of Congress" despite appellants' claim that the mandate was enacted into law by the Legislative Reorganization Act of 1946, 60 Stat. 812. *See* Krebs v. Ashbrook, 275 F.Supp. 111 (1967), aff'd, 132 U.S.App.D.C. 176, 407 F.2d 306 (1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 619, 21 L.Ed.2d 570 (1969).

7. The District Court held that under the doctrine of separation of powers there was no justiciable issue or jurisdiction to grant relief, and that plaintiffs had an adequate remedy at law in case of criminal prosecution.

8. Appellants Young, Davis, Hayden, Dellinger and Greenblatt.

9. Appellants Hoffman and Rubin.

10. Rule XI, as amended, provides in part: The Committee on Internal Security, acting as a whole or by the subcommittee, is authorized to make investigations from time to time of (1) the extent, character, objectives, and activities within the United States of organ-

izations or groups, whether of foreign or domestic origin, their members, agents, and affiliates, which seek to establish or assist in the establishment of a totalitarian dictatorship within the United States, or to overthrow or alter, or assist in the overthrow or alteration of, the form of government of the United States or of any State thereof, by force, violence, treachery, espionage, sabotage, insurrection, or any unlawful means, (2) the extent, character, objectives, and activities within the United States of organizations or groups, their members, agents, and affiliates, which incite or employ acts of force, violence, terrorism, or any unlawful means, to obstruct or oppose the lawful authority of the Government of the United States in the execution of any law or policy affecting the internal security of the United States, and (3) all other questions, including the administration and execution of any law of the United States, or any portion of law, relating to the foregoing that would aid the Congress or any committee of the House in any necessary remedial legislation.

constitutional rights. In addition to the relief requested in their original complaint, appellants sought a declaratory judgment that Rule XI as amended is unconstitutional, and permanent and preliminary injunctions preventing the use of the alleged political blacklists. The District Court, on July 3, 1969, again granted appellees' motion to dismiss.[11] This appeal followed.[12]

We affirm because for reasons to be explained the complaints, although they describe a controversy of a sort between themselves and appellees, we think do not allege the sort of "case" or "controversy" referred to in Article III of the Constitution, the source of jurisdiction of the federal courts. Jurisdiction over the general subject of the litigation does reside in the courts, but the complaint must show that there exists a controversy between the parties with such immediacy and presently adversary character as to require its adjudication. Assuming that plaintiffs were entitled to add members of the Committee staff as defendants, it is in the respect last referred to, as we shall explain, in which we find the litigation does not now present the elements essential to jurisdiction as an Article III controversy between the parties to the litigation.

## II.

The original complaint, in seeking injunctive and declaratory relief with respect to (1) the mandate of the House Committee on Un-American Activities, (2) the resolution authorizing the investigation involving appellants, and (3) the enforcement of the subpoenas, rested upon service upon appellants of subpoenas to appear before the Committee and upon appellants' apprehension of enforcement of the subpoenas in criminal proceedings. It has eventuated, however, as outlined above, that any involvement of appellants with the previous Committee due to the subpoenas has ceased. The original complaint accordingly does not set forth a live dispute requiring adjudication as to the constitutionality of that Committee's mandate or investigating resolution. The investigation has ended, the Committee has been abolished, and no action associated with the subpoenas or hearing is threatened respecting appellants.[13] The case as framed in the original complaint accordingly is moot.[14] A federal "Court

11. The District Court dismissed the request for an injunction on the following grounds: appellants have no standing to sue; they have an adequate remedy at law in the event of a criminal proceeding; former Rule XI is no longer in effect; and, in any event, it is constitutional; there is no justiciable issue with respect to H.Res. 89, amending Rule XI; and, in any event, H.Res. 89 is constitutional. The declaratory judgment was also dismissed because there was no suitable decree available and there was no justiciable issue.

12. Appellants also appeal the denial by the District Court of a motion to add as defendants two staff employees of the Committee on Internal Security. They did not object, however, to the dismissal of the Attorney General and the United States Attorney as defendants.

13. This situation is quite different from that involved in Stamler v. Willis, 415 F.2d 1365 (7th Cir. 1969), cert. denied, *sub nom.* Ichord v. Stamler, 399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796

(1970). In that case, at the time the Court of Appeals held that their civil suit could proceed to trial for determination of their challenge to the constitutional basis for the Committee, criminal proceedings had been instituted and were pending against the plaintiffs. At an earlier stage of this *Stamler* case, however, in Stamler v. Willis, 371 F.2d 413 (7th Cir. 1966), the court had held, prior to the initiation of criminal proceedings, that a substantial constitutional question was raised against the predecessor committee by allegations the Committee was "pillorying" plaintiffs and other witnesses. The court relied upon language of the Supreme Court in Gojack v. United States, 384 U.S. 702, 86 S.Ct. 1689, 16 L.Ed.2d 870 (1966), which the court construed to intimate Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), might be considered by the Court as limited to the circumstances of that case.

14. It is unnecessary to consider whether the Supplemental Complaint's allegation

does not sit to decide arguments after events have put them to rest." Doremus v. Board of Education, 342 U.S. 429, 433, 72 S.Ct. 394, 396, 96 L.Ed. 475 (1952). United States v. Alaska Steamship Co., 253 U.S. 113, 40 S.Ct. 448, 64 L.Ed. 808 (1920); St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L. Ed. 1199 (1943); District of Columbia v. Barry, 128 U.S.App.D.C. 295, 387 F. 2d 860 (1967). There is no such likelihood that appellants will be called before the present Committee as to permit application of the continuing controversy doctrine with respect to the original complaint. *Compare* Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 178–179, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Jeannette Rankin Brigade v. Chief of the Capitol Police, 137 U.S.App.D.C. 155, 157–158, 421 F.2d 1090, 1092–1093 (1969). The mooted character of the case resting upon that complaint drains it of content of a case or controversy within the meaning of Article III of the Constitution.

### III.

The Supplemental Complaint differs from the original. Although it resembles the latter in challenging the mandate of the newly created House Committee on Internal Security, it adds a new element to the situation. As we have set forth above it alleges that the Committee has in its possession numerous dossiers compiled by the former Committee and that the personal information in these dossiers is made available "as a political

blacklist to discriminate against citizens, deny them employment," to deter them from freely expressing their political opinions and otherwise from exercising their constitutional rights, and "accordingly" injuring appellants in the exercise of their constitutional rights by the use and threat of use of the information respecting them.

The Supplemental Complaint, however, not only fails to designate a single instance of use of information respecting appellants or anyone else, or threatened with respect to anyone, but more importantly seeks to bring appellees into conflict with appellants only by alleging the use or threat of use of dossiers in a manner harmful not to appellants but to others, in the exercise of their constitutional rights; appellants allege only inferentially that because of the use respecting others the information accordingly will be used respecting them.[15] And we add that with respect to the other citizens and organizations the allegations are in unspecific and conclusional terms. *See* DuBois Clubs of America v. Clark, 389 U.S. 309, 312–313, 88 S.Ct. 450, 19 L.Ed.2d 546 (1967).

The question here is not one of mootness but whether for a different reason an Article III case or controversy appears. Stated most favorably to appellants this we think comes down to whether it can fairly be held that the allegations respecting the files describe a factual situation which has such a chilling effect upon the exercise by appellants of their constitutional rights, especially those protected by the First Amendment, as to constitute an Article III case or controversy between appellants and appellees.

as to a "political blacklist" prevents the challenge of the former Committee's mandate and resolution from being moot, or preserves the need to seal its records, for, as will appear *infra*, this allegation is insufficient to present a case or controversy between appellants and appellees.

15. In a memorandum to the District Court in answer to appellees' motion to dismiss the Supplemental Complaint, and in their briefs in this court, appellants cite vari-

ous "admissions" in the Congressional Record to the claimed use of political blacklists. Their briefs in addition refer to various examples of their use appearing in the same source, to a report of state litigation, and to a newspaper magazine article. As in their complaints, however, there is no indication that any information possessed by or under the control of the Committee will be put to a non-legislative use detrimental to appellants.

■ Appellees contend that in any event the court may not intervene because of the doctrine of separation of powers. They cite Hutcheson v. United States, 369 U.S. 599, 622, 82 S.Ct. 1005, 8 L.Ed.2d 137 (1962), and Barenblatt v. United States, 360 U.S. 109, 132–133, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), to the effect that one branch of the Government may not lightly interfere with the exercise of its legitimate power by a coordinate branch, such as the exercise by Congress of its power of investigation in aid of legislation. This judicial admonition, however, enunciated in cases which involved only part of the spectrum of the judiciary's responsibility in relation to Congress, must be read with decisions of the Supreme Court where individual rights were alleged to be infringed by Congress in circumstances which required constitutional adjudication. Thus, for example, in Powell v. McCormack, 395 U.S. 486, 516, 89 S.Ct. 1944, 23 L.Ed.2d 491, et seq. (1969), it was held that judicial review of a decision on the part of the House of Representatives to exclude one of its members was justiciable notwithstanding the contention based upon separation of powers. The Court stated that an individual's claim of a constitutional right, and, we may add, an individual's claim of infringement of such a right,

> falls within the traditional role accorded courts to interpret the law, and does not involve a "lack of the respect due [a] coordinate [branch] of government," nor does it involve an "initial policy determination of a kind clearly for nonjudicial discretion." Baker v. Carr, 369 U.S. 186, at 217 [82 S.Ct. 691, at 710, 7 L.Ed.2d 663].

The Court continued,

> Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The

alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility. See United States v. Brown, 381 U.S. 437, 462 [85 S.Ct. 1707, 1722, 14 L.Ed.2d 484] (1965); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 613–14 [72 S.Ct. 863, 898, 96 L.Ed. 1153] (1952) (Frankfurter, J., concurring); Myers v. United States, 272 U.S. 52, 293 [47 S.Ct. 21, 71 L.Ed. 160] (1926) (Brandeis, J., dissenting).

395 U.S. 548–549, 89 S.Ct. 1978. See also United States v. Robel, 389 U.S. 258, 264, 267–268, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Stamler v. Willis, supra, 415 F.2d at 1369–1370.

■ We accordingly do not withhold decision on the merits because of the argument based on separation of powers. In all cases, however, the factual content must add up to an Article III case or controversy. The criteria for this can be no less when the courts are asked to pass upon the constitutionality of the charter and conduct of a committee of Congress than when the question arises in other litigation. It is here we find the present complaints factually and legally inadequate. All that remains unmooted is the existence of the present Committee with substantial changes in membership, the files, and the claim of misuse and threatened misuse of information in the files, with, however, only an inferential form of allegation respecting the use of information about appellants based on conclusional allegations respecting others. Indeed the Supplemental Complaint itself alleges no specific instance of non-legislative use with respect to any particular person. The allegations do not charge conduct by present appellees causing or threatening injury to appellants with a factual content which brings the parties into controversy of such present aliveness and immediacy as to require the courts to render a constitutional decision.[16]

16. The inter-relationship of standing, mootness and of justiciability, on the one hand, and a case or controversy, on the other, has been fully developed recently in

The principle involved has been stated recently in Golden v. Zwickler, 394 U.S. 103, 108, 110, 89 S.Ct. 956, 959–960, 22 L.Ed.2d 113 (1969), as follows:

"[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite. This is as true of declaratory judgments as any other field." United Public Workers of America [C.I.O.] v. Mitchell, 330 U.S. 75, 89 [67 S.Ct. 556, 564, 91 L.Ed. 754] (1947). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 [61 S.Ct. 510, 512, 85 L.Ed. 826] (1941).

\*   \*   \*   \*   \*   \*

The constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance. In United Public Workers of America [C.I.O.] v. Mitchell, *supra*, at 89–90 [67 S.Ct. at 564,] we said:

"The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough."

■ Implicit in our conclusion is the view that such chilling effect on the exercise of First Amendment rights as inheres in the existence, hearings, files of the Committee and the possible use of the files, is not of a degree which places in the hands of appellants a right to require the court to adjudicate the constitutional challenge they advance against appellees. Among the considerations pertinent to determining the existence of a chilling effect upon the exercise of First Amendment rights which give rise to a case or controversy are the source of the chill, the extent to which it focuses upon the conduct of those who allege it, and the likelihood that it will affect that conduct. The free exercise of First Amendment rights is perhaps more readily inhibited by a law justifiably suspect as vague or overbroad, because of the uncertainty of its application,[17] than from the apprehension that a law, valid on its face, will be unconstitutionally administered. In the former case, "the danger of tolerating, in the area of First Amendment freedoms," a "statute susceptible of sweeping and improper application," NAACP v. Button, *supra*, 371 U.S. at 433, 83 S.Ct. at 338, is that one may feel obligated to guide his conduct by what is potentially proscribed. Baggett v. Bullitt, *supra*, 377 U.S. at 372, 84 S.Ct. 1316; Keyishian v. Board of Regents, 385 U.S. at 601, 87 S.Ct. 675; National Student Ass'n v. Hershey, 134 U.S.App.D.C. 56, 64, 412 F.2d 1103, 1111 (1969). In the latter

Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). There is no suggestion in that case, however, of a departure from the views expressed in Golden v. Zwickler, *infra*, as to the nature of an Article III case or controversy. Note, Chilling Effect in Constitutional Law, 69 Col.L.Rev. 808, 821–822 (1969).

17. Illustrative of decisions involving such statutes are Zwickler v. Zoota, 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 601, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967); Baggett v. Bullitt, 377 U.S. 360, 372, 378–379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

case the chill, to be judicially cognizable, must be presented in a concrete factual setting specifying plausible threats of improper administration.[18] And in both instances the court must be persuaded that there is a genuine possibility that an individual's conduct will be affected before entering upon constitutional adjudication. Though it is not feasible to gauge a chilling effect by differences in the sensitivity of different individuals who might be affected, it would seem reasonable to assume that some resistance to chill resides in the average individual due to his recognition of his right of speech and association, protected by the First Amendment, as well as due to his human personality.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the source of the chilling effect which led the Court not to abstain from adjudication of the validity of a state statute was in the history of harassing criminal prosecutions of the plaintiffs under a statute suspect for the overbreadth of its regulatory scheme. No criminal proceeding or other harassment by the Committee now confronts appellants. In National Students Ass'n v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969), the chilling effect which gave rise to a case or controversy was a directive which authorized local draft boards to deny military deferment to those students whom the boards considered to be engaging in illegal demonstrations. We have no order of any sort directed to appellants, or to any larger group of which they are a part.

In Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), where the Court was concerned with the related problems of standing —*and see* note 16, *supra*—the allegations held to support the standing of plaintiff to attack the constitutionality of the state statute more directly brought the administrators of the statute into an existing conflict with the plaintiff. As an example, the Court referred to the allegations that the defendants "procured false statements of criminal activities and used such statements to initiate baseless criminal proceedings against" plaintiff. 395 U.S. at 419, 89 S.Ct. at 1847.

If a chilling effect exists in the present case it must emanate (1) from the existence of the Committee and the history of its predecessor, and (2) the possible use of the information in the Committee's files. As to the former appellants urge that the mandate, Rule XI as amended, is overly broad and vague in authorizing investigations into "propaganda" which would include "clearly protected activity." Aside from the merits of such a broadbased attack on Rule XI, *see* Barenblatt v. United States, *supra*, appellants have failed to bring the fear of investigation by the present Committee home to themselves. That the new Committee will seek to investigate their activities is wholly speculative. Nor does the possible use of the information in the Committee's files give rise to an Article III case or controversy between these parties. It is not claimed that any non-legislative use of the Committee's files is authorized by the Committee's mandate, no matter how broadly construed by appellants; and appellants do not allege except as we have indicated that the files have been or will be used to their personal detriment.[19] We think in a frontal attack of this sort upon the Committee

---

18. *See, e. g.,* Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); DuBois Clubs v. Clark, *supra.*

19. If appellants themselves do not occupy a position in relation to the Committee which has those adversary features essential to give the court jurisdiction their claim of representation of a class adds nothing helpful to their ability to maintain the suit. National Student Ass'n v. Hershey, *supra,* 134 U.S.App.D.C. at 72–74, 412 F.2d at 1119–1121; Watkins v. Chicago Housing Authority, 406 F.2d 1234, 1235–1236 (7th Cir. 1969); Kansas City, Mo. v. Williams, 205 F.2d 47, 51–52 (8th Cir.), cert. denied, 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (1953). *Cf.* Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962);

some existing or threatened adverse action by the present Committee more directly associated with the suitor must be alleged.

For the reasons we have given we affirm the dismissal of the complaints, without reaching the question of constitutionality of the mandate of either the former Committee on Un-American Activities or of the present Committee on Internal Security, or the question of the lawfulness of the existence or alleged use of the files in the possession of the present Committee.[20] The primary responsibility for the policing of the files rests with the House of Representatives and its Committee. Situations may arise with respect to the Committee's conduct which call for judicial intervention at the suit of individuals—*see* Ichord v. Stamler, *supra,* and its earlier history outlined in footnote 13, *supra*— but the complaints, in respects not mooted, allege differences of appellants with appellees regarding the existence, hearings and files of the Committee which do not, for the reasons we have stated, give rise to a dispute of the "immediacy" and "reality" required for constitutional adjudication. Golden v. Zwickler, *supra.*

Affirmed.

LEVENTHAL, Circuit Judge (concurring):

I concur in the opinion insofar as it upholds the dismissal of the original complaint. As to the dismissal of the supplemental complaint, I concur in the judgment but I feel a different analysis is required.

The majority say that the supplemental complaint fails to present the elements of "case or controversy" required by Article III of the Constitution as a prerequisite to jurisdiction of a federal court to entertain an action. If this is sound the case must be dismissed for want of subject matter jurisdiction. In my view this litigation involves the elements required by the case or controversy clause.

What is sought is a declaration of plaintiffs' rights, and the case certainly presents, indeed fairly bristles with, adversaries and adversary interests.

There are questions of justiciability insofar as the action is brought against Congressmen. But this issue need not be faced since plaintiffs have moved to add parties defendant so that their action may be maintained against non-elected members of the staff of the House Committee. In my view that motion should have been granted on the authority of Powell v. McCormack, 395 U. S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Dombrowski v. Eastland, 387 U.S. 82 87, S.Ct. 1425, 18 L.Ed.2d 577 (1967); Stamler v. Willis, 415 F.2d 1365 (7th Cir. 1969), cert. denied *sub nom.* Ichord v. Stamler, 399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796, 1970. Under these cases, if I read them right, the circumstance that an action lacks "justiciability" insofar as plaintiffs seek a decree directed at and binding on elected Congressmen, does not negative justiciability to entertain the action as against members of Committee staffs. Perhaps this doctrine means that actions of certain Congressmen may be immune from judicial scrutiny if all actions are taken by Congressmen themselves, but lose that immunity if the Congressmen call on non-elected staffs to take actions on a

Wilson v. Kelley, 294 F.Supp. 1005, 1010–1011 (N.D.Ga.) (three-judge court), aff'd, 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed. 2d 425 (1968). There may be cases where injury that is done or immediately threatened to some members of a defined group of which a plaintiff is a party may be sufficient to give rise to a chilling effect upon the plaintiff; but the mere bringing of an action as a class action on behalf of "all persons who seek to exercise freely their rights guaranteed in the First Amendment" does not avoid the requirement of the specificity necessary to state a case or controversy.

20. Were it in order to construe the Supplemental Complaint as not limited to a challenge to the constitutionality of Rule XI, but to include a challenge to the constitutionality of the use of the files, assuming the constitutionality of the Rule, the result we reach would be the same.

basis that must be assumed, for purposes of testing jurisdiction, to be in violation of their oath of office, and official duties and obligations.

Appellants seek declaration that the staffs may not lawfully have access to or disclose to others information in the files of the Committee concerning plaintiffs. The issue is real, definite and concrete. This signifies to me the court has jurisdiction to entertain the action. This comes close to being merely a bare statement of an ultimate conclusion, and contrary to that reached by my brethren. Perhaps I can explain my position better by supposing that an action were brought against a private firm, alleging that it was the successor of an enterprise which had acted illegally and in violation of plaintiff's rights both in obtaining information about plaintiff (and others), and in the disseminating of such information to others, including persons and agencies maintaining illegal "blacklists"; that the successor had not consigned the files to dead storage in a warehouse or other archives, but was keeping the files in such manner that they were accessible to an active staff, and that plaintiff sought a declaration that these files could not validly be used or disseminated by the staff of the successor enterprise. Perhaps plaintiff bringing such an action would not triumph on the merits, but it seems clear to me that the case would lie within the jurisdiction of a federal court as a case or controversy. And I think that constitutional issue is no different because defendants are employees of the legislative branch.

The fact that defendants are Congressional staff is relevant in the case, but to another issue, whether the court should exercise its sound judicial discretion to dismiss the action without a determination on the merits. Such judicial discretion has been exercised for hundreds of years in equity cases, on the ground that the case must be dismissed "for want of equity," due to failure to show imminent, irreparable injury. The Declaratory Judgment Act has expanded not the jurisdiction of the court but the scope of actions that may be maintained consistently with sound exercise of judicial discretion, dispensing inter alia with the need for allegations of threatened irreparable injury.

The Declaratory Judgment Act grants authority to Federal courts "in cases of actual controversy." This includes all the elements of "controversy" comprehended within Article III—the need for a "real and substantial controversy" that is "definite and concrete, touching the legal regulations of parties having adverse legal interests." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

Pertinent doctrine, however, seems to me to provide or permit the dismissal, without adjudication on the merits, of an action brought under the Declaratory Judgment Act notwithstanding the existence of Article III jurisdiction. Thus the use of the term "actual controversy," rather than merely "controversy," although early referred to as connoting "emphasis rather than definition," [1] was given particular emphasis in Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). And the Court's ruling that the action, as of the time of remand, did not relate to a controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" [2] seems to me to be a modern counterpart of the older doctrine providing for dismissal for want of equity.

There is a concept of "public interest" that limits the scope of actions maintainable under the Declaratory Judgment Act. This element appears, e. g., in Public Affairs Associates v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), where the Court declined to enter a ruling on an application for a dec-

---

1. Aetna Ins. Co. v. Haworth, *supra*, 300 U.S. at 240, 57 S.Ct. 461.

2. *See* 394 U.S. at 108, 89 S.Ct. at 959–960, quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

laration of the right to publish uncopyrighted speeches delivered by a public official.[3] The Court said, see pp. 112–113, 82 S.Ct. p. 582:

> The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so. [Citations omitted.]

Of course a District Court cannot decline to entertain such an action as a matter of whim or personal disinclination. "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." Eccles v. Peoples Bank, 333 U.S. 426, 431 [68 S.Ct. 641, 644, 92 L.Ed. 784]. We have cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations. Eccles v. Peoples Bank, supra, at 432 [68 S.Ct. at 644].

In these cases we are asked to determine matters of serious public concern. They relate to claims to intellectual property arising out of public employment. They thus raise questions touching the responsibilities and immunities of those engaged in the public service, particularly high officers, and the rightful demands of the Government and the public upon those serving it. These are delicate problems; their solution is bound to have far-reaching import. Adjudication of such problems, certainly by way of resort to a discretionary declaratory judgment, should rest on an adequate and full-bodied record. The record before us is woefully lacking in these requirements.

The "public interest" concept highlights for me the existence of parallels to be found between judicial doctrines announced as a gloss on the Declaratory Judgment Act and the doctrines that pulsed in chancery. The importance of "public interest" in equity doctrine was underscored by Justice Stone, a life-long student of equity, who taught it formally at Columbia Law School before he extended the reach of his rostrum to the Court. In his historic decision in Virginian Ry. v. System Federation No. 40, 300 U.S. 515, p. 552, 57 S.Ct. 592, p. 601, 81 L.Ed. 789 (1937), he wrote (citations omitted):

> Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.

It should not escape unnoticed that public interest considerations may lead to extension as well as curtailment of relief—a concept that would seem fully applicable to judgments under the Declaratory Judgment Act.

In Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 the Court drew on this "supple principle" to fashion the so-called abstention doctrine—which still has vitality in special circumstances,[4] saying (p. 500, 61 S.Ct. p. 645):

> The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. * * * Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies * * *.

My own perceptions of appropriate doctrine have been sharpened by more recent opinions of the Court concerned with ripeness of actions to set aside administrative commands. In Abbott Laboratories v. Gardner, 387 U.S. 136, 87

---

3. In *Rickover* the court did not dismiss the action, but remanded for amplification of the record. In the case before us, it seems appropriate to apply the underlying principle through an order dismissing the complaint. See Toilet Goods

Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), discussed below.

4. Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Court permitted drug manufacturers to bring an action, for declaratory and injunctive relief, that challenged the validity of regulations requiring that labels for prescription drugs identify their "established names." The Court said (at pp. 148–149, 153, 87 S.Ct. at pp. 1515–1518):

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.
>
> As to the former factor, we believe the issues presented are appropriate for judicial resolution at this time. First, all parties agree that the issue tendered is a purely legal one: Whether the statute was properly construed by the Commissioner to require the established name of the drug to be used *every time* the proprietary name is employed.
>
> \* \* \* \* \* \*
>
> Where the legal issue presented is fit for judicial resolution, and where a

regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to non-compliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance, neither of which appears here.

On the same day, in Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S. Ct. 1520, 18 L.Ed.2d 697 (1967), the Court affirmed an order granting a motion to dismiss the complaint on the ground that the case was inappropriate for declaratory relief.[5] The case was one in which cosmetics manufacturers sought to challenge an FDA regulation that permitted the certification of color additives to be suspended as to firms denying FDA employees access to manufacturing facilities and formulae.

The Court held that the controversy did not meet the criteria of *Abbott* because the Court concluded that the underlying questions of whether the regulation was justified by the statutory scheme as a whole required a "judicial appraisal of these factors [that] is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." (387 U.S. at 163–164, 87 S.Ct. at 1524).[6]

The Court also took into account the "minimal" adverse consequences that would result from requiring the manufacturers to challenge the regulation by protesting a specific application, and concluded (387 U.S. at p. 166, 87 S.Ct. at p. 1525):

> [We] think it wiser to require them to exhaust this administrative process through which the factual basis of the

---

5. Toilet Goods Association v. Gardner, 360 F.2d 677 at 679 (2d Cir. 1966).

6. The Court had said (p. 163–64, 87 S.Ct. p. 1524) that the issue of validity "will depend not merely on an inquiry into statutory purpose, but concurrently on an

understanding of what types of enforcement problems are encountered by the FDA, the need for various sorts of supervision in order to effectuate the goals of the Act, and the safeguards devised to protect legitimate trade secrets (see 21 CFR § 130.14(c))."

inspection order will certainly be aired and where more light may be thrown on the Commissioner's statutory and practical justifications for the regulation. *Compare* Federal Security Adm'r v. Quaker Oats Co., 318 U.S. 218 [63 S.Ct. 589, 87 L.Ed. 724]. Judicial review will then be available, and a court at that juncture will be in a better position to deal with the question of statutory authority.

Similar considerations are applicable in the case before us. Plaintiffs refer to possibilities of misuse of material available to members of committee staffs. The doctrine of ripeness is properly examined with respect to the maintainability of an action for a declaratory judgment, even assuming constitutional jurisdiction over a case or controversy. Doctrines of ripeness are not fungible, to be transferred in bulk from one type of case to another. In the case at bar, there are cross-currents. On the one hand, plaintiffs are asserting constitutional rights, which present an element of public interest leading the court to maintain the action and to consider the claim on its merits. On the other hand, the fact that the action is constitutionally maintainable against committee staffs (and possibly Congressmen) involves the public interest consideration that they should not be required to defend their actions, which are presumptively in the public interest, unless there is a specific showing of actions taken by them or plainly threatened by them which entail a discernible impact on plaintiffs' lives and protected freedoms.

There is judicial wisdom and sound discretion in avoiding "needless friction" with the coordinate legislative branch of the Federal Government, at least to the point of deferring decisions until the controversy is so sharpened by a specific factual context as to permit a sure-footed judicial appraisal of the pertinent factors. Since appellants do not allege any imminent impact on their own activities it is "wiser," as the Supreme Court put it, to defer any intervention of the judicial process. The possibility of impact on the lives of others is a consideration for a broad reading on the merits of the scope of constitutional rights, but its inherent abstractness only reinforces the importance of awaiting a specific impairment or threatened impairment in order to assure a sure-footed judicial disposition.

The importance of a specific, factual context is dealt with at some length in the court's opinion. But it seems to me important that the issue and ruling should be discussed, as in the *Gardner* cases, in terms of discretion and the propriety of entertaining actions seeking injunctive or declaratory relief, rather than in terms of constitutional jurisdiction. When problems are fluid, and the courts are engaged in a delicate balance of interests, the use of constitutional categories seems to me to impose unnecessarily rigid and restrictive limitations, and to inhibit the kind of wide-ranging and flexible analysis that is needed.

Since the judicial discretion that is involved in such matters is a sound discretion, turning on a determination of public interest, its exercise is subject to appellate review, and a federal court may not lightly turn aside a suitor who seeks a hearing and decision of his federal constitutional rights. Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L. Ed.2d 444 (1967). In the case before us, however, the pertinent criteria fully sustain the exercise of sound discretion to dismiss this action in its present context. Although the ruling of the District Court did not purport to constitute the exercise of discretion, the nature of the controversy, and the fullness of appellate review, are such as to make it appropriate for this court to exercise in the first instance the sound judicial discretion that is appropriate.