**AMERICAN SERVICEMEN'S UNION**
**et al., Plaintiffs,**

v.

**John N. MITCHELL et al., Defendants.**

**Civ. A. No. 1776–71.**

United States District Court,
District of Columbia.

Jan. 10, 1972.

Melvin L. Wulf, Sanford J. Rosen, American Civil Liberties Union Foundation, New York City, Hope Eastman, ACLU, Washington, D. C., for plaintiffs.

Oran H. Waterman, Dept. of Justice, Washington, D. C., for defendant U. S. Atty. Gen.

Bernard Waters, Gen. Counsel, Subversive Activities Control Bd., Washington, D. C., for defendant SACB.

## MEMORANDUM AND ORDER

GESELL, District Judge.

Nine different organizations [1] have brought this action for declaratory judgment and permanent injunction claiming that Executive Order 11605 and the so-called Attorney General's List, which is given further vigor thereunder, are unconstitutional. The Attorney General and defendant members of the Subversive Activities Control Board answered, denying all material allegations of the complaint and thereafter moved to dismiss. This motion is before the Court on unverified pleadings and without any affidavits or other factual data. Plaintiffs served 120 interrogatories on defendants but the Court stayed these demands pending consideration of the motion.

The challenged Executive Order was signed by President Nixon on July 2, 1971. It is in the form of amendments to earlier Executive Orders, particularly Order 10450, under which Federal personnel since 1953 have been subject to special investigation in the interests of national security designed to assure, among other things, "complete and unswerving loyalty to the United States." Pursuant to these Executive Orders, the Attorney General designated and circulated a list of so-called subversive organizations, later known as the Attorney General's List of Subversive Organizations, so that any membership or affiliation with such an organization could be considered as bearing on eligibility for employment or continued employment in the Federal Government. No group has been added to the list for 16 years. 117 Cong.Rec.H. 1189 (July 27, 1971).

Executive Order 11605 delegates to the Subversive Activities Control Board [2] the function of designating which new organizations should be listed on the Attorney General's List. [3] In order to carry out this function, the Board is directed to hold hearings and make findings as to the status of any "organization, association, movement, group, or combination of persons" which the Attorney General by petition suggests is "totalitarian, fascist, communist, subversive," or which has "adopted a policy of unlawfully advocating the commission of acts of force or violence to deny others their rights under the Constitution or laws of the United States or of any State, or which seeks to overthrow the government of the United States or any State or subdivision thereof by unlawful

1. American Servicemen's Union
   Center for Marxist Education
   Communist Party of the United States of America
   Industrial Workers of the World
   National Peace Action Coalition
   People's Coalition for Peace and Justice
   Socialist Workers Party
   Young Socialist Alliance
   Young Workers Liberation League

2. The Subversive Activities Control Board was created by Congress in 1950 to provide a registry of organizations which were Communist-action, Communist-front, or later Communist-infiltrated. 50 U.S. C. § 791 et seq. The statute has been

amended several times and has been the subject of numerous court decisions, the most notable of which are Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965); DuBois Clubs of America v. Clark, 389 U.S. 309, 88 S.Ct. 450, 19 L.Ed.2d 546 (1967); and Boorda v. Subversive Activities Control Board, 137 U.S. App.D.C. 207, 421 F.2d 1142 (1969).

3. The Executive Order also authorizes the SACB to remove an organization from the Attorney General's List if the Board determines that the organization "does not currently meet the standards for designation." Executive Order 11605(2) (i).

means." Numerous broad, imprecise definitions of terms within this general category expand and becloud the meaning to a point where it is fairly obvious that the Attorney General can by petition initiate hearings into the activities of almost any group that has been an active protest group using techniques of mass demonstrations, sit-ins, or other so-called "non-violent" techniques such as those associated with many anti-war organizations. In addition, the Order may be applied to various racist organizations and other militant groups on the far left or far right which seek to accomplish their objectives by unlawful means.[4]

This is, of course, an equitable proceeding. The Court has broad discretion and should not entertain this action unless the Court is satisfied there is need to intervene to protect rights of litigants immediately threatened by an actual and ascertainable controversy.

Six of the plaintiff organizations in various ways oppose military authority or the Vietnam war, or have programs furthering the revolutionary principles of Marx, Lenin or Trotsky. They are not presently on the Attorney General's List. They aver that they and their members "fear" continued advocacy of their beliefs will subject them to proceedings under the Order and that once such proceedings start each of them and their members will be irreparably injured by losing Government employment and will be penalized in other respects solely because of their political beliefs and associations. It is apparent from the allegations that at least some of the organizations, particularly the anti-war organizations, are direct-action groups that on occasion have "taken to the streets" but none of the plaintiffs acknowledge that they have engaged in or sponsored unlawful conduct.[5]

---

4. For example, subsection 2(d) of the Order reads:

> (d) The Board may determine that an organization has adopted a policy of unlawfully advocating the commission of acts of force or violence to deny others their constitutional or statutory rights or that an ·organization seeks to overthrow the government of the United States or any State or subdivision thereof by unlawful means if it is found that such group engages in, unlawfully advocates, or has among its purposes or objectives, or adopts as a means of obtaining any of its purposes or objectives—
>
> (1) The commission of acts of force or violence or other unlawful acts to deny others their rights or benefits guaranteed by the Constitution or laws of the United States or of the several States or political subdivisions thereof; or
>
> (2) The unlawful damage or destruction of property; or injury to persons; or
>
> (3) The overthrow or destruction of the government of the United States or the government of any State, Territory, district, or possession thereof, or the government of any political subdivision therein, by unlawful means; or

> (4) The commission of acts which violate laws pertaining to treason, rebellion or insurrection, riots or civil disorders, seditious conspiracy, sabotage, trading with the enemy, obstruction of the recruiting and enlistment service of the United States, impeding officers of the United States, or related crimes or offenses.

5. The other three plaintiff organizations are already on the Attorney General's List but claim to be injured because of procedures established under the Order which would affect them in the event they become involved in delisting proceedings. The organizations have been on the list for many years. In one case, the listing was litigated. Industrial Workers of the World v. Clark, 128 U.S.App.D.C. 165, 385 F.2d 687 (1967). In the other two cases the organizations failed for 18 years to utilize the existing expungement procedures. In all three cases, it is difficult to see how they are irreparably injured at present by new procedures for delisting. If they seek delisting but wish to challenge the new delisting procedures, they must first exhaust their administrative remedies.

Apart from the disturbing implications of this effort to revitalize a loyalty program that has found little favor, the issues presented by the complaint are extremely serious and must eventually be resolved. There is, for example, no precedent for a President delegating to an independent, quasi-judicial body far-reaching responsibilities different in form and effect from those specifically given that body when created by the Congress. Moreover, Congress has never authorized the delegation attempted in this instance. The argument is advanced that Congress subsequently ratified this unusual action by authorizing an appropriation. But there is a serious question whether congressional action taken under the procedurally complex and rushed atmosphere of a $4 billion omnibus appropriation bill constitutes ratification when the amount appropriated for this special program was very small and when the House of Representatives initially voted on the bill ten days before the Executive Order was issued.[6] Wholly apart from the question of delegation, the Order contains definitions governing listing that appear on their face to raise constitutional problems by reason of their vagueness and overbreadth and the resulting effect on the rights of many Government workers, present or future.[7]

■ Plaintiffs purport to sue as representatives of a class invoking Rule 23(b) of the Federal Rules of Civil Procedure and in support thereof advance their individual claims. The class is defined in the following terms:

The class of plaintiffs encompasses all American citizens who have, do, or intend to advocate ideas, policies, and political positions which are unpopular, controversial, or who otherwise dissent from the ideas, policies, and political positions predominant in American society. This class, which includes groups of all political persuasions—radical, liberal and conservative—is so numerous that joinder of all members is impossible. . . .

There is no such identifiable class as a matter of law and this part of the pleading is purely atmospheric and insubstantial. Accordingly, the complaint can be considered only in terms of the separate individual claims of the named plaintiffs.

■ The Court is persuaded that the complaint does not establish that these difficult and extremely troublesome matters are presently ripe for determination. This action is premature. As Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207 (1970), teaches, the Court should not consider even constitutional claims that are abstract, speculative and of no pressing immediacy. The wisdom of this course is apparent from the circumstances of this particular controversy. Plaintiffs' activities are divergent. No action has been taken against any of them under the Order or indeed against anyone else. Thus no factual context for decision is available. It is suggested nonetheless that the Order has an immediate, discernible impact on the unlisted plaintiff organizations because of its chilling effect. Yet plain-

---

6. Not only did the $450,000 of the $4 billion appropriation pass the House intended to be applied to the old, unamended SACB functions, but numerous Congressmen and Senators expressed doubt as to the legal effect of the passage of the appropriation act, and it was repeatedly stated that the matter would have to be tested ultimately by the courts. In addition, it is apparent that when the Conference Report was finally accepted by the Senate, one of the major reasons for the Senate's acquiescence was the need for the 99.99% of the funds unaffected by the Executive Order. 117 Congressional Record S. 11446–11450 (July 19, 1971). 117 Cong.Rec.H. 7178–7185 (July 27, 1971), and 117 CongRec.S. 13021–13047 (August 3, 1971.)

7. See footnote 4, *supra*.

tiffs ask for elaborate discovery to reinforce their fears, thus showing how marginal the chill contention is at the present juncture. It is obvious these fears are premised more on political intuition than on legal developments of which the Court can take cognizance.[8] Enforcement policies under the Order have not yet jelled. The Attorney General is presently seeking legislative authority for the Board to use its subpoena power in implementation of the Order. Failure to obtain this authority and to obtain authorization for court review which is also being sought could abort the entire project.

The Courts are not policymakers and judges must be cautious when asked to intervene in matters such as this where a continuing controversy between the Executive and the Congress may be reasonably expected and political considerations will not be absent in the final resolution.

Sound adjudication requires that Courts permit latent controversy to mature to a point where decision can be made in the context of established fact. Some loaves of bread fail to rise when put in the oven and the taste may belie the recipe. Courts may err if they permit the speculation of special interest plaintiffs to be substituted for the greater truth of actual events. The vague words "chilling effect" cover many degrees of chill and it is necessary to distinguish between the fear of catching flu, a possible shiver or two, and that hard chill that stifles free exercise

of a definite constitutional right. Ours is a very complex and varied society and it was not the intention of the framers of the Constitution that courts must act as the immediate arbitrators of every potential conflict. There is a broad discretion, particularly in cases arising under the Declaratory Judgment Act, which, as Judge Leventhal has so ably developed in his concurring opinion in Davis v. Ichord, 442 F.2d at 1216–1220, is a continuation of the broad discretion of the equity court and remains fundamental to our constitutional system of separate powers. The course of wisdom here is for adjudication to be stayed until the controversy develops at least to a point where a judgment can be based on something more than mere speculation.[9] Forebearance in the absence of irreparable injury is a teaching of equity. Sound constitutional doctrine will not develop if courts act in unnecessary haste.

Much litigation lies ahead. Those affected are represented by attorneys knowledgeable in constitutional law. There is no prospect that any of the numerous issues tendered by these pleadings will go by default.

If the Order is implemented by an informative petition of the Attorney General, this will establish a basis for whatever organization is challenged and those similarly situated to test the delegation and the alleged overbreadth of the Order before hearings are held.

The defendants' motion to dismiss is granted. So ordered.

---

8. None of the organizations, for example, allege whether their members or potential members presently are employed or seek employment with the Federal Government and to what extent these members are or would be affected by the organization being considered for the Attorney General's List. In a case as important and complex as this, these are not matters as to which a court should guess.

9. "We have cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." Public Affairs Associates v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962).