The AMERICAN CIVIL LIBERTIES UNION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION, and United States of America, Respondents.

No. 73–2886.

United States Court of Appeals, Ninth Circuit.

Sept. 16, 1975.

production capacity at the time this action was commenced was less than it was in 1927.

Dennis Grossman (argued), American Civil Liberties Union, New York City, for petitioner.

Gregoary M. Christopher (argued), Counsel, Federal Communications Commission, Washington, D. C., for respondents.

## OPINION

Before CHAMBERS, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge:

The American Civil Liberties Union (ACLU) brings this petition to review two specific aspects of the Federal Communications Commission's order promulgating rules and regulations pertaining to cable television (CATV) set forth in 36 F.C.C.2d 141 (1972) with the reconsideration appearing in 36 F.C.C.2d 326

(1972). The two aspects challenged are the failure of the Commission (1) to impose common carrier obligations on cable television access channels and (2) to limit cablecasting by the cable owner to one channel. We affirm the order and deny the petition for review.

## I.

### Jurisdiction and Venue.

■ Jurisdiction to consider ACLU's petition rests on 28 U.S.C. § 2342, 28 U.S.C. § 2344, and 47 U.S.C. § 402(a). In an earlier proceeding involving this petition before the Court of Appeals, District of Columbia Circuit, the Commission moved to dismiss the petition as one not timely filed, and, in the alternative, to transfer the petition to this circuit pursuant to 28 U.S.C. § 2112(a) (1970). The Court of Appeals of the District denied the motion to dismiss and transferred the petition to this circuit. 158 U.S. App.D.C. 344, 486 F.2d 411 (1973). Although the Commission suggests that both dispositions be overturned by this court, we declined to do so. A proper concern for promoting an economy of judicial effort, whether that be expressed as the law of the case or otherwise, plainly requires that we not relitigate the issues raised by the Commission in the Court of Appeals of the District.

■ We take this position even though the circumstances upon which the Court of Appeals of the District re-lied in granting the Commission's motion to transfer to this circuit have changed. Specifically, the Commission's motion under 28 U.S.C. § 2112(a) (1970)[1] was based upon the fact that certain petitions for review "with respect to the same order" previously had been filed in this circuit. The Commission argued that since the proceedings commenced by these petitions were "first instituted" it was the duty of the Court of Appeals of the District to transfer these proceedings to this circuit. This position was adopted by the Court of Appeals of the District. It now appears, however, that these "first instituted" proceedings were remanded to the Commission by this court on the Commission's motion several months prior to oral argument in this case. We do not believe this defeats our jurisdiction, makes improper venue in this court under 28 U.S.C. § 2343, or requires relitigating the issues of which the Court of Appeals of the District previously disposed. 158 U.S.App.D.C. 344, 486 F.2d 411 (1973). Once a valid transfer pursuant to 28 U.S.C. § 2112(a) (1970) has been accomplished, its validity ordinarily should not be impaired by the subsequent fate of the proceeding "first instituted."[2]

## II.

### Standing.

The Commission also challenges the standing of the ACLU to bring this petition for review under 5 U.S.C. § 702[3]

---

1. 28 U.S.C. § 2112(a) reads in part as follows:
   . . . If proceedings have been instituted in two or more courts of appeals with respect to the same order the agency, board, commission, or officer concerned shall file the record in that one of such courts in which a proceeding with respect to such order was first instituted. The other courts in which such proceedings are pending shall thereupon transfer them to the court of appeals in which the record has been filed. For the convenience of the parties in the interest of justice such court may thereafter transfer all the proceedings with respect to such order to any other court of appeals.

2. This case is distinguishable from *Valley Vision Inc. v. F. C. C.*, 399 F.2d 511 (9th Cir. 1968) in which this court returned to the Court of Appeals of the District a case previously

transferred to it by that court. The re-transfer was on the ground that 47 U.S.C. § 402(b)(7) vested in the Court of Appeals of the District exclusive jurisdiction of appeals from cease and desist orders of the Commission. The appeal here is based on 47 U.S.C. § 402(a) and not § 402(b).

   The court in which proceedings "are first instituted," of course, may transfer the proceedings to any other court of appeals "for the convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a), *supra*, n. 1.

3. A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 392, 5 U.S.C. § 702.

and 28 U.S.C. § 2344.[4] The ACLU, asserts the Commission, has suffered no legal wrong nor been "adversely affected or aggrieved by agency action." Assuming that standing to appear before the Commission and standing to seek judicial review of a Commission order are governed by the same standard (an assumption heretofore recognized by the Court of Appeals of the District of Columbia Circuit in *Office of Communication of United Church of Christ v. F. C. C.*, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), n. 8), the Commission claim comes rather late inasmuch as the ACLU appears to have participated vigorously in the rulemaking procedure which led to the order here being reviewed. However, our resolution of the standing issue is not influenced by this delay.

We are guided by the fact that the listening and viewing audience of a station, acting through a legitimate representative, has been accorded standing to intervene before the Commission in that station's license renewal proceeding. *Office of Communication of United Church of Christ v. F. C. C., supra.* The interest of the "consumer" was held sufficient to justify standing. Furthermore, we are required to interpret 5 U.S.C. § 702 as did the Supreme Court in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). There the Court said that persons have "standing to obtain judicial review of federal agency action under § 10 of the APA [5 U.S.C. § 702] where they had alleged that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the

zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." *Id.* at 733, 92 S.Ct. at 1365. The necessity of an "injury in fact," the Court continued, is not eliminated by the existence of an "interest in a problem," *Id.* at 739; one "seeking review must allege facts showing that he is himself adversely affected . . .". *Id.* at 740, 92 S.Ct. at 1368.

ACLU, a membership corporation under New York law, in effect alleges that it represents its members who have suffered an injury in fact because of the two aspects of the Commission's order here being challenged consisting of a failure to maximize the number of sources of programming to be carried by cable television. This injury is plainly within the zone of interests to be protected or regulated, asserts the ACLU, because maximization of sources of programming is "a basic tenet of national communications policy," *First Report and Order on CATV*, 20 F.C.C.2d 201, 205 (1969), and consistent with the purposes of the First Amendment.

While these allegations indicate an injury no different from that which would be suffered by all "consumers" of the product of CATV, that alone is not sufficient to preclude standing. *See United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Nor are we prepared to assert that ACLU's allegations merely restate an "interest in a problem," *viz.* the regulation of cable television. The issue before us is different. It is simply whether the record available to us sufficiently demonstrates the *existence* of the alleged in-

---

4. *§ 2344. Review of orders; time; notice; contents of petition; service.*

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—
　(1) the nature of the proceedings as to which review is sought;

(2) the facts on which venue is based;
(3) the grounds on which relief is sought; and
(4) the relief prayed.
The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt. *Added* Pub.L. 89–554, § 4(e), Sept. 6, 1966, 80 Stat. 622. 28 U.S.C. § 2344.

jury. Unlike the situation which exists in many environmental cases, for example, in which the alleged injury is so palpable as to be subject to judicial notice, we here are confronted with circumstances in which the truth of the allegation of injury in fact can only be determined by examining the merits of the asserted claim. If the ACLU's petition for review is meritorious it follows that its members have suffered an injury in fact. Quite frequently, and perhaps usually, the determination of the truth of the allegation of an injury in fact does not require an examination of the merits of the claim asserted. Under circumstances frequently existing, the issue of standing can be regarded as independent of the merits. Such is not the case here, however.

The result is, that there is no escape from examining the merits. If ACLU's claim is meritorious, standing exists; if not, standing not only fails but also ceases to be relevant.[5]

### III.

### The Merits.

#### A. Mode of Regulation.

All recognize that "Cable television offers the technological and economic potential of an economy of abundance." 25 F.C.C.2d 38, 39 (1970). This is true because of the large number of channels which it is technologically possible for a single cable system to possess. Systems having no less than 60 channels appear to have been installed, 36 F.C.C.2d 141, 190 (1972), although a "20-channel" system is generally adequate to meet presently foreseeable demand. 46 F.C.C.2d

175, 180 (1974). Carriage of television broadcast signals, the original function of cable systems, cannot absorb all of these channels. The channels not employed in the carriage of television broadcast signals provide the opportunity for the development of a medium of communication not precisely like any with which we are presently familiar. The Report to the President by the Cabinet Committee on Cable Communications (1974) put the prospects this way:

"We believe that cable development has the potential of creating an electronic medium of communications more diverse, more pluralistic, and more open, more like the print and film media than our present broadcast system. It could provide minority groups, ethnic groups, the aged, the young, or people living in the same neighborhood an opportunity to express, and see expressed, their own views. Yet it would also enable all of these groups to be exposed to the views of others, free of the homogeneity which characterizes contemporary television programming." *Id.* at 15.

Future prospects are not present reality, however. A period of growth and development is needed. The Commission in the order here challenged attempted to establish, in its words, "a basic framework within which we may measure cable's technological promise, assess its role in our nationwide scheme of communications, and learn how to adapt its potential for energetic growth to serve the public." 36 F.C.C.2d at 189.

The envisioned "basic framework" requires the allocation of the available channels between the carriage of televi-

---

**5.** Judge Trask, in dissenting, takes us to task for "avoiding" the standing issue. We do not believe we have done so. Our view is that this is not the type of case in which it is possible to say that even though ACLU might be right on the merits (*viz.* that FCC improperly failed to maximize the number of sources of programs to be carried by cable television) it has no standing. Rather we are convinced that if ACLU is right on the merits the requisites of standing exist. We do not read *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) to be contrary. While the Supreme

Court in that case may have enhanced the vigor of the requirement that there be a "distinct and palpable injury" to the party seeking standing, it did not overrule *United States v. SCRAP, supra* and *Sierra Club v. Morton, supra.* Judge Trask appears to believe that even if ACLU is right on the merits, the injury to its members is not sufficiently distinct and palpable to warrant standing. We disagree. Standing is not limited to those showing "economic harm." In passing, it is interesting to observe how closely Judge Trask in his analysis of standing comes to discussing the merits.

sion broadcast signals, 47 CFR §§ 76.51–76.55, origination cablecasting (under certain circumstances) on "one or more designated channels," 47 CFR § 76.201, and so-called "access channel" use, 47 CFR § 76.251. The "access channels" consist of at least one "public access channel," "education access channel," and "local government access channel," and such "leased access channels" as the system permits. 47 CFR § 76.251(a)(4), (5), (6), (7).

Public access channels must be subject to rules requiring first-come non-discriminatory access.[6] 47 CFR § 76.251(a)(11). At least one public access channel must be made available without charge. However, a charge for production costs of live studio presentations exceeding five minutes may be assessed. 47 CFR § 76.251(a)(10)(ii). The presentation of commercial and political advertising is prohibited. 47 CFR § 76.251(a)(11)(i).

Education access channels, available for use by local educational authorities,[7] must be offered free of charge for at least five years after the completion of the system's basic trunk line. 47 CFR § 76.251(a)(10)(i). Commercial and political advertising are also barred. 47 CFR § 76.251(a)(11)(ii).

Local government access channels, available for use for local government purposes, also must be offered free of charge during the same period as is applicable to education access channels. 47 CFR § 76.251(a)(10)(i). No restrictions on advertising are imposed.

Leased access channels must be subject to rules requiring first-come non-discriminatory access, sponsorship identification, an appropriate rate schedule, and permitting public inspection of a record of the names and addresses of those requesting time. 47 CFR § 76.-251(a)(11)(iii). There exist no restrictions on the level of charges that may be imposed. 46 F.C.C.2d 175, 185–6, 199–200 (1974).

Each of the above types of channels, other than local government channels, may not present lottery information or obscene or indecent matter. 47 CFR § 76.251(a)(11)(i), (ii), and (iii). No other restrictions, other than those relating to commercial and political advertising, on program content exist.

The Commission recognizes that this mode of regulation is interim in nature. 36 F.C.C.2d 194 (1972); 46 F.C.C.2d 175, 184–5 (1974). Access channels pose many issues which the Commission does not believe its present experience enables it to deal with satisfactorily. Its approach, as reflected by the regulatory structure here sketched, is to impose relatively few restrictions on the use of access channels and await the results of the private ordering which time and experience will provide. Specifically, it recognizes that while common carrier status may become an appropriate regulatory structure in the future, the present is better served by rules which allow the forces of the market place to function freely.[8] Rate regulation in the absence of experience it believes would be detrimental to the development of cable television.

## B. ACLU's Position.

The ACLU's position is fundamentally different from that of the Commission. The ACLU wishes to have access channels treated as common carriers and regulated in the manner provided by Subchapter II of the Communications Act of 1934. 47 U.S.C. §§ 201–222. Consistent with this objective, the ACLU urges that origination cablecasting by cable system owners be limited to one channel rather

---

6. The Commission has recognized that reservation of public access channel time on a long-term basis is permissible so long as this does not unreasonably exclude the occasional programmer from access to desirable time slots. 46 F.C.C.2d 175, 183 (1974).

7. This embraces more than the local public school board. "Any bona fide educational interest should have access to the educational channel." 46 F.C.C.2d 175, 185. Commercial educational enterprises are excluded, however. *Id.*

8. 46 F.C.C.2d 175, 185.

than to "one or more" channels as the challenged regulations permit.

ACLU asserts that a cable system regulated in this manner would (1) more completely guard against unreasonable discrimination in providing access to channels, (2) provide tariffs for use of access channels setting forth maximum and minimum charges, (3) secure the availability of access channels "upon reasonable request therefor" (47 U.S.C. § 201(a)), and (4) prevent the cable system operator from preempting the bulk of the revenues which the use of the access channels would generate. The consequences of such regulation would be to maximize the sources of programming asserts the ACLU.

This is not a position without merit. Access channels, from a technological point of view, could function as common carriers.[9] The Cabinet Committee on Cable Communications, moreover, in its Report to the President (1974) recommended that following a transition period the control of cable distribution facilities be separated from control of programming. Report, p. 29. Cross-subsidization of the programs of the owner of the cable system at the expense of other users of the system was a danger which the Cabinet Committee sought to avoid by its recommendation. The ACLU would serve the same purpose by its proposals. On the other hand, the Cabinet Committee recommended against regulation by any governmental authority of the prices charged to subscribers and channel users. Report, p. 38. The ACLU's position requires just such regulation.

The Commission, with commendable candor, has recognized the merits of the ACLU position. It was rejected as being "premature." 36 F.C.C.2d 197 (1972). In lieu thereof, the Commission fashioned its regulations to provide an incentive to the cable system operator to originate material attractive to subscribers and to avoid constraints on experimenta-

tion and innovation. 36 F.C.C.2d 352 (1972).

## C. Disposition on the Merits.

It is not for this court to substitute its judgment for that of the Commission. The position taken by the Commission is a rational choice and does not represent arbitrary and capricious action. Substantial evidence supports its decision. To prevail, the ACLU must demonstrate that adoption of its proposals is required by the statute from which the Commission derives its authority to regulate CATV. This it cannot do.

The question of the authority of the Commission to regulate CATV was an open one until the Supreme Court spoke in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). In dealing with a challenge to the Commission's authority to regulate CATV, which at that time served only the dual functions of improving reception of local stations and transmitting the signals of distant stations, the Court held that the Commission's authority rested on the Communications Act of 1934, 47 U.S.C. §§ 152(a) and 303(r). Neither provision specifically addresses the problems of CATV, whatever its form or technological complexity. Both are general and expansive in tone and scope. Thus, § 152(a) commences with the words "The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio . . .", and § 303(r) provides that the Commission shall have authority to "Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . .". Notwithstanding this generality, earlier doubts by the Commission of its authority to regulate, 26 F.C.C. 403, 427–31 (1959), and an attempt by the Commission to have Congress enact legislation specifically granting such authority, the Court recognized that § 152(a) vested the Com-

---

**9.** See the definition of a common carrier set forth in *Frontier Broadcasting Co. v. Collier*, 24 F.C.C. 251, 254 (1958).

mission with such authority as is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." 392 U.S. at 178, 88 S.Ct. at 2005. This authority is not subject to the precise restrictions imposed by either Subchapter II of the 1934 Act, dealing with common carriers, or Subchapter III, dealing with broadcasters.

This source of jurisdiction was again recognized by the Court in *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1971) when it held that the Commission's program initiation rule, now in 47 CFR § 76.201(a), was "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting." 406 U.S. at 663, 92 S.Ct. at 1868. At no point did the Court either in the plurality, concurring, or dissenting opinion, hold or suggest that CATV, even when its dual functions recognized in *Southwestern Cable Co.* are augmented by required origination cablecasting, is subject to the exclusive governance of either Subchapter II or III.

■■■ These two decisions are the markers by which we must be guided. Together they indicate that the Commission's authority to regulate CATV is very broad and not circumscribed by the rules of Subchapters II and III. More precisely, we believe, and so hold, that the Commission's failure to impose common carrier obligations on access channels and its imposition of the rules above described are actions "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting." To hold otherwise would ignore the history of the Commission's efforts to regulate CATV, be contrary to the unmistakable teaching of the Supreme Court, and indicate a conviction on our part that the ACLU is right in insisting on common carrier status now which we do not possess.

■■■ While our holding is not dependent upon such decisions as *Frontier*

*Broadcasting Company v. Collier*, 24 F.C.C. 251 (1958) and *Philadelphia Television Broadcasting Co. v. F. C. C.*, 123 U.S.App.D.C. 298, 359 F.2d 282 (1956), which asserted or held that the Commission was not required to regulate CATV under Subchapter II, we do regard these decisions as historically instructive. The evolution of CATV regulation under the authority described in *Southwestern Cable Co.* and *Midwest Video Corp.* should not at this late date be governed by Subchapter II simply because access channels, a portion of a cable system's capacity, possess technical characteristics which make possible their regulation as a common carrier. We, like the Court of Appeals of the District of Columbia Circuit, believe that the Commission must be accorded flexibility in dealing with CATV and that its jurisdiction should not be "rigidly compartmentalized into 'licensing' and 'public utility regulation' functions." *Buckeye Cablevision, Inc. v. F. C. C.*, 128 U.S.App.D.C. 262, 267, 387 F.2d 220, 225, n. 19 (1967). The task of reducing this flexibility, if such is to be done, more properly belongs to the Congress than to the courts. This view is strengthened, rather than weakened, by the fact that the present regulatory structure of cable television may be the result of a compromise reached by the affected industries and adopted by the Commission which some find objectionable on one ground or another.[10]

In sum, the Commission has authority to promulgate the regulations of which the ACLU complains and the future of these regulations to impose common carrier status on access channels and to limit cablecasting by the cable owner to one channel is neither arbitrary nor capricious.

Affirmed.

TRASK, Circuit Judge (dissenting):

With deference it is submitted that the majority was in error in reaching the merits of the American Civil Liberties

---

10. *See* Nole, Peck, McGowan, Economic Aspects of Television Regulation, 179–82, 205–07 (1973).

Union's petition for review. It seems apparent that the ACLU has no standing to bring this suit and that the dispute between the ACLU and the FCC is not now ripe for review.

## I. *Standing*

The court reasons that this is a case in which a determination of the merits is necessary in order to decide whether there is standing, and that therefore the standing question need not be directly confronted. The recent decision of the Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), precludes such an approach. The Supreme Court there stated: ". . . standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . ." At 500, 95 S.Ct. at 2206. Later, the Court stated: ". . . reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." 422 U.S. at 501, 95 S.Ct. at 2206. The Court went on to assume for purposes of determining standing that, on a motion to dismiss, the plaintiffs in the case before it had proved that the local government unit had intentionally and unconstitutionally excluded racial and ethnic minorities from the community by restrictive zoning and other housing related regulations. The Court then proceeded to determine whether the individual plaintiff had standing. The majority's avoidance of the standing issue in the instant case is erroneous.

In this case the proceedings come to us for review upon a different record. There is no complaint containing allegations of fact which must be taken as true for the purpose of ruling on a motion to dismiss. The fact that no plead-

ings exist upon which a basis for standing may be examined does not, however, eliminate appellant's duty to otherwise establish it, nor justify our consideration of the merits in order to determine the threshold question.

An examination of the proceedings to date and of the interests of the ACLU and its members reveals that the ACLU has no standing. This proceeding had its origins in a Notice of Rule Making issued by the FCC in Docket 18373, adopted November 6, 1968. 33 Fed.Reg. 17855 (1968). The initial notice was followed by subsequent notices all eventually focusing on Docket 18397.[1] Rule making is not a process necessarily set in motion by any individualized grievance or adversary confrontation, but by a general need for guidelines to operate a system or an industry. The stated purpose of the rule making procedure was to make inquiry into the long-range development of cable television and to explore:

" ' . . . [H]ow best to obtain, consistent with the public interest standard of the Communications Act, the full benefits of developing communications technology for the public, with particular immediate reference to CATV technology and potential services . . . . ' " 36 FCC 2d 143, 144 (1972).

The massive Cable Television Report and Order of the FCC together with its Reconsideration of Cable Television Report and Order covers 335 pages including concurring and dissenting views of the Commissioners. More than 3 years time went into the report and order during which the FCC gathered data, solicited views, heard argument, evaluated studies, examined alternatives and held final discussions. 36 FCC 2d at 327 ¶ 2. Representative broadcast[2] and cable tel-

---

1. Notice of Proposed Rule Making and Notice of Inquiry in Docket 18397, 15 FCC2d 417, 33 Fed.Reg. 19028 (1968); Notice of Proposed Rule Making in Docket 18416, 34 Fed.Reg. 872 (1968); Further Notice of Proposed Rule Making in Docket 18397, 22 FCC2d 603, 34 Fed. Reg. 7981 (1969); Second Further Notice of Proposed Rule Making in Docket 18397–A, 24 FCC2d 580, 35 Fed.Reg. 11045 (1970).

2. National Association of Broadcasters, Columbia Broadcasting System, National Broadcasting System and other network and individual interests.

evision[3] interests were participants in the hearings. Program suppliers, such as MCA, Inc. and Allied Artists Pictures Corporation, asserting copyright views, and groups not directly connected with the industry such as ACLU were also participants pursuant to the public notice.

No complaint is made by the ACLU that it was denied the right to a hearing or an opportunity to submit its views before the FCC as was the case in *Office of Communication of United Church of Christ v. FCC*, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). Its response to the question of standing before this court is stated in its reply brief at page 2 as follows:

"The ACLU filed this Petition for Review in an attempt (1) to seek reversal of the Commission's decision declining to apply Title II of the Federal Communications Act (dealing with common carriers) to the access bandwidth of cable television, and (2) to procure reversal of the Commission's decision below permitting cable television entrepreneurs to use more than one channel for their own programming. The importance of these issues to the ACLU lay not only in the ACLU's long-standing concern for the First Amendment interests in maximizing the diversity of television programming sources, but also in the fact that significant numbers of the ACLU's more than 250,000 members are themselves cable television viewers and/or subscribers. These ACLU members are, therefore, directly and adversely affected by the specific regulations of which the ACLU seeks review." (Footnote omitted.)

Petitioner does not tell us how the failure of the Commission to apply common carrier status and regulations to the access bandwidth of cable television has caused or will cause it or its members to be "aggrieved" or "injured in fact." It does not charge that the programming of CATV under the order will be racially discriminatory, will be offensive to viewers or will restrict full and fair expression of views, or that the action of the Commission is arbitrary or capricious. It simply disagrees with the regulatory policies developed by the rule making body, particularly with how best to "maximize the diversity of television program sources."

Specifically, on the first issue, that the FCC must regulate CATV access channels as common carriers under Title II of the Federal Communications Act, 47 U.S.C. § 201 *et seq.*, the ACLU offers four arguments. The first is that the FCC regulations contain no prohibition against the cable operator's arbitrary discrimination in favor of some educational authorities against others. The reason why the rule makes public access, governmental access and leased access channels available on a "first come, non-discriminatory" basis but does not use the quoted language with reference to educational channels, does not appear. There is, however, certainly nothing in any of the language of the regulations to indicate that discrimination is invited or anticipated on the educational channels. In fact, two years after adoption of the rules the Commission promulgated "Clarification of the Cable Television Rules," 46 FCC 2d 176 (1974). The Commission said:

"Our educational access channel rules were designed to promote the use of that channel by educational authorities in the community. Much was claimed in the original dockets which led to the adoption of this rule about the potential for educational channels on cable. Little has developed. In retrospect, it appears that our limitation of one free educational access channel was wise. Designating vast channel capacity for education only to see it lie fallow serves no purpose."

. . . . .

"Our concept of 'educational authority' was not meant to restrict the use of this channel to the local public

---

3. The National Cable Television Association and other CATV interests and operators.

school board. Any school, college, or university, public or private, formal or informal, should have the opportunity to air programming on this channel. . . ."

The single exception would apply to commercial educational enterprises such as beauty schools, computer schools, etc.

"Any bona fide educational interest · should have access to the educational channel. . . ." 46 FCC 2d at 185.

Thus the policy of the Commission is certainly not phrased in terms of discrimination; every indication is exactly the opposite. In any event, petitioner does not assert any existing or proposed future discrimination against a school or school authority.

The second reason argued by the ACLU for compelling common carrier status for cable television operators is that 47 U.S.C. § 205(a) provides for FCC regulation of charges by any "carriers" as defined by 47 U.S.C. §§ 152, 153(h). However, argues petitioner, the FCC has expressly authorized cable system owners to charge what they please for the use of leased access channels. First of all, reliance upon the language of Title II of the Communications Act of 1934 (of which 47 U.S.C. § 205(a) is a part) to conclude that cable television systems are common carriers, is misplaced. The "carriers" to which those provisions apply, 47 U.S.C. §§ 152, 153(h), have not been determined to include cable television, as the majority points out. Again, however, the argument is addressed to a very abstract question. Not one of petitioner members, as a viewer or potential operator, is alleged to be endangered by charges which might prevail under the FCC order. The charges under a system of open competition could be more or less than under a regulated monopoly system.

A third argument to support common carrier status is that a "no regulation" system does not ensure that leased access channels will be available to independent programmers over periods of sufficient duration to justify the investment. But no evidence is produced to show that the possible danger will ever become a reality. Again we talk in terms of policy, not in terms of persons aggrieved. In its Report and Order the Commission said:

"The question of what regulations we should impose at this time is most difficult. · Our judgments on how these access services will evolve are at best intuitive. We believe that the best course is to proceed with only minimal regulation in order to obtain experience. We emphasize, therefore, that the regulatory pattern is· interim in nature—that we may alter the program as we gain the necessary insights." 36 FCC 2d 143, 194 (1972).

Petitioner suggests no actual controversy that the existing rule has engendered.

The final argument in support of the need for common carrier regulation is that there is nothing in the current rules to ensure that CATV owners will increase their channel capacity to meet growing demand as would be the case were the access bandwidths regulated as common carriers. But as petitioner's brief points out, Petitioner's Brief at 30–31, there is an expansion procedure to increase the number of available channels. 47 C.F.R. § 76.251(a)(8). Petitioner argues simply that it is not enough. Again, no actual or threatened injury is alleged. The argument made is that petitioner's approach is better.

Thus, the first issue submitted, i. e., that the order of the FCC is "inconsistent with the status of cable television's access bandwidth as a common carrier," Petitioner's Brief at 42, does not present a case or controversy in the constitutional sense under Article III. *Warth v. Seldin*, 422 at 498–501, 95 S.Ct. 2197 (1975). The petitioner has failed to assert that as an entity it has suffered "some threatened or actual injury . . . ." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), or that any of its members are thus af-

fected. *Warth v. Seldin, supra* at 498–499, 95 S.Ct. 2197.[4]

The second challenged policy of the FCC was its order authorizing origination cablecasting on more than one designated channel. 47 C.F.R. § 76.201(a) (repealed). Petitioners first acknowledge that the Court in *United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), upheld the origination broadcasting rule about which petitioners complain. Then they cautiously admit that the rule is "currently under review by the Commission," but state that even if the rule is repealed it would leave the cable operators with the prerogative to engage in origination broadcasting "at their discretion." Petitioner's Brief at 35–36. They then conclude that even this prerogative "contravenes both the Communications Act and the free speech provision of the First Amendment." *Id.* at 36. The

ACLU provides no authority for this argument. Petitioner has not suggested that any operator is now engaging in the practice of originating broadcasts on more than one channel or plans to do so, or, that if done, just how it would violate anyone's first amendment rights.[5]

The issue on review has become moot since the FCC has repealed the mandatory origination rule about which complaint is made,[6] and the ACLU's argument that the FCC should have prohibited origination broadcasting by CATV owners on more than one station fails for lack of showing of ordinary standing criteria.

## II. *Ripeness*

An additional ground for dismissing this case is the evident lack of ripeness of the controversy. In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 8 L.Ed.2d 681 (1967),

---

4. In addition, it is difficult to discern how the agency review provisions can be relied upon to grant standing to those in petitioner's position or those whom petitioner claims to represent. The viewer members do not fall within the holding of *Office of Communication of United Church of Christ v. FCC, supra*. There a regional television operator was charged with having engaged in racially discriminatory programming and overemphasis of commercials, all of which was offensive to its viewers. Here there is simply a difference of opinion as to how best to achieve industry-wide goals.

28 U.S.C. § 2344 which applies to review of final orders of the FCC provides in part that "Any party aggrieved by the final order may . . . file a petition to review the order in the court of appeals . . . ."

Petitioner is not "aggrieved" in any explicated sense even though it participated in the proceedings before the FCC and undertook there to urge that common carrier regulation would better serve the public than limited free competition. The "party aggrieved" rule governing review of FCC actions cannot apply unless the bare fact that the ACLU disagrees with the FCC's adoption of a limited free enterprise type of regulation rather than the common carrier type sought by ACLU creates a grievance within the rules of standing. Should it do so it simply leads to the result that the ultimate decision upon policy in rule making is shifted to the courts for final determination rather than the decision remaining with the Commission which was delegated

that authority by act of Congress. In the absence of a cause of action based upon Article III's minimum requirements this should not be so.

In fact, CATV licenses are not open on a completely free basis to anyone who might choose to develop an outlet. Section 76.11 of the Order, 36 FCC 2d at 217, 47 C.F.R. § 76.11, provides that no cable television system shall commence operations or add a television broadcast signal to existing operations unless it receives a certificate of compliance from the Commission. Thereafter rather detailed rules state the requirements of the application and provide for public notice and for objections to applications. 36 FCC 2d at 217–19, 47 C.F.R. §§ 76.11–76.17.

Preliminary views of the FCC appeared to favor at least partial common carrier service, 20 FCC 2d 201, 202 ¶ 3 (1969), yet the Commission withheld final decision on the issue until further study, *id.* at 207 ¶ 16. *See* 23 FCC 2d 825, 827 ¶ 5 (1970).

5. To confound the confusion of its reasoning petitioner argues, Petitioner's Brief at 37, that the origination requirement of the now repealed regulation implemented the national communications policy of maximizing diversity in the sources of programming, citing *Midwest Video Corp., supra* at 668 n. 27, but that a cable operator's prerogative to engage in multi-channel origination cablecasting does *not* serve this policy.

6. 39 Fed.Reg. 43302, 43310 (1974).

the Supreme Court, discussing the ripeness doctrine, stated:

> ". . . its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

In *Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the Court applied this standard to a formally promulgated regulation of the Department of Health, Education, and Welfare that permitted the Commissioner of Food and Drugs to suspend "certification service" to manufacturers of food additives who refused to allow government inspectors to enter their plants. Without certification an additive was deemed unsafe. Plaintiffs challenged the regulation in the district court seeking declaratory and injunctive relief and claiming that the regulation was in excess of the Secretary's authority. The Court found that the issue would be more readily resolved in the context of an enforcement proceeding rather than the generalized challenge before it. It further ruled that the adverse effect on the plaintiffs was "minimal" because the plaintiffs' primary activity, its day-to-day business, would not be affected by the regulation, and because the harm of going through an enforcement proceeding was not great.

On the facts of this case judicial resolution of the Commission's authority to promulgate the CATV regulations in question would be greatly aided by the facts of a particular dispute. If a CATV owner refuses to provide channel access to an independent program producer at some time in the future, ACLU members who view CATV programs could claim that they have been denied the full range of program variety that common carrier regulation and a rule preventing origination broadcasting by CATV owners on more than one channel would entitle them to. In this context the FCC's broad discretion over the choice of regulatory forms would be more readily reviewable in the light of the statute's strictures on common carriers and the alleged first amendment problems in multiple origination by CATV owners. It might be that a case would clearly present a conflict that would illuminate the competing interests and considerations.

It is similarly very difficult to see any "irremedial adverse consequences," *Toilet Goods Assn., supra* at 164, 87 S.Ct. 1520, that would flow from this court's declining to review the regulations at this time. The ACLU has not claimed that any of the possible injuries have actually occurred. ACLU member/viewers do not now suffer from not seeing programs that would otherwise have been broadcast had the FCC chosen to regulate differently. If their fear that this will be the case actually develops they can seek judicial review then.

The only adverse consequence the ACLU might suffer from this court's declining to review the regulations at this time would be that the CATV channel access industry will develop in such a way that the interests the ACLU seeks to vindicate—maximization of the sources of programs and broadcasts—would be seriously undermined. It is difficult to see this as a realistic threat. The Commission is not allocating a scarce resource that once divided will be difficult to undo without huge disruptive effects on the industry and on other parties. The channel capacity of a CATV system is for all intents and purposes an unlimited one. Should it be determined at some future time that a CATV owner has refused access to a potential broadcaster and that this is impermissible under the Act, the CATV owner can be ordered to provide more channels for leased access use; the costs to the CATV

owner and to the CATV industry would be negligible to meet any such new requirement. The court should decline to review the regulations because the controversy is not yet ripe.[7]

7. There is no significance to the fact that the present case is upon review of a rule making procedure rather than an adjudicatory proceeding. The ripeness doctrine applies to review of rules as well as to specific adjudications. *Bristol-Meyers Co. v. FTC*, 138 U.S. App.D.C. 22, 424 F.2d 935, 940 (1970) (dictum), *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). *See Davis v. Ichord*, 143 U.S.App.D.C. 183, 442 F.2d 1207, 1219–20 (1970) (Levanthal, J., concurring).