**PLAYBOY ENTERPRISES, INC., et al., Plaintiffs,**

v.

**Edwin MEESE III, Attorney General of the United States, et al., Defendants.**

**MAGAZINE PUBLISHERS ASSOCIATION, Plaintiff,**

v.

**Edwin MEESE III, Attorney General of the United States, et al., Defendants.**

**Civ. A. Nos. 86–1346, 86–1447.**

United States District Court, District of Columbia.

July 3, 1986.
As Amended July 23, 1986.

Bruce J. Ennis, Washington, D.C., for Playboy Enterprises, Inc.

Andrew Lipps, Washington, D.C., for Magazine Publishers Ass'n.

Sharon L. Reich, Dept. Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

The plaintiffs in these consolidated actions seek to have the Court permanently enjoin the defendants, who are members of the Attorney General's Commission on Pornography (Commission), as members of the Commission and individually, from publicly disseminating a "blacklist" or from taking other action for the purpose of censoring and suppressing the distribution and sale of Playboy Magazine and other publications that are said to be lawfully and constitutionally protected. The case is now before the Court on the plaintiffs' motions for a preliminary injunction.[1]

The plaintiffs in Civil Action No. 86–1346 are Playboy Enterprises, Inc. (PEI), American Booksellers Association, Inc. (ABA), a trade association of general interest bookstores said to represent 4,000 separate

---

1. A related action, *Penthouse International Ltd. v. Meese,* Civil Action No. 86–1515 was transferred to this court from the Southern District of New York. Although Penthouse also seeks injunctive relief, it opposed consolidation with these cases since it seeks to undertake discovery before pursuing its motion for injunctive relief. While the Court has not ruled on the defendants' motion to consolidate Penthouse with these cases, it did rule that the motion for consolidation would be held in abeyance pending consideration of the motions for preliminary injunction in these cases.

members operating approximately 7,000 book stores, Council for Periodical Distributors Associations, Inc. (CPDA) representing approximately 400 members who are engaged in the distribution of magazines, paperback books, comics, newspapers and other periodicals, and International Periodical Distributors Association, Inc. (IPDA), a trade association for the principal national periodical distributors engaged in the business of distributing or arranging for the distribution of paperback books and periodicals to wholesalers throughout the United States for ultimate distribution to retailers and the public.

## I

Briefly stated, the underlying facts are as follows: On March 29, 1985, at the request of President Ronald Reagan and pursuant to the Federal Advisory Committee Act (FACA), 5 U.S.C.App. § 1 *et. seq.*, the Attorney General, William French Smith, chartered the Attorney General's Commission on Pornography. The charter of the Commission states in part:

> The objectives of the Commission are to determine the nature, extent, and impact on society of pornography in the United States, and to make specific recommendations to the Attorney General concerning more effective ways in which the spread of pornography could be contained, consistent with constitutional guarantees.

The Commission held a series of six public hearings to obtain testimony from a variety of witnesses representing a broad spectrum of opinion, which included representatives of some of the plaintiffs. The Commission heard approximately 200 witnesses. Following the hearing, the Commission held public meetings at which the members discussed the testimony they had received and the shape the final report should take, and the further conduct of their undertaking. In subsequent public meetings, the Commission discussed the drafts of the chapters of the final report, and the substance of their discussions is reflected in minutes and transcripts that

are also available to the public. In early May 1986, the Commission released a draft of the final report, which, the defendants represent that, except for some minor editorial changes, constitutes the substance of the final report. Defendants' Memorandum in Opposition to Motions for a Preliminary Injunction and Support of Defendants' Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (Defendants' Opposition) at 10. The Commission intends to issue and disseminate the report in early July 1986.

At a public hearing held on October 17, 1985, in Los Angeles, Reverend Donald Wildmon, the Executive Director of the National Federation of Decency testified before the Commission that certain corporations were engaged in the sale of pornography, which, in his view, included *Playboy* and *Penthouse* magazines. He also submitted a written statement setting forth his views. PEI Motion Exhibit C, MPA Motion Exhibit 4, Defendants' Opposition Exhibit B. At a public meeting held in January 1986, the Commission discussed the question of whether Reverend Wildmon's allegations should be included in the final report. Some of the members felt that before even addressing the question of whether his testimony or similar testimony should be included, corporations identified as being involved in the sale or distribution of pornography should be permitted the opportunity to respond. Eventually, it was decided to send a letter to those corporations. As a result, the subject letter was sent to those corporations. See Appendix.

The letter did not describe the "testimony", or state who gave the testimony, or advise the addressees that the letter had been based on the "testimony" and the written statement of one person, Reverend Wildmon. The Commission did attach a copy of Reverend Wildmon's written statement to each letter, but did not identify the author of the statement.

The Commission received a number of responses to their letters. Southland Corporation, the owners of 7–Eleven Stores, noted that the corporation had been follow-

ing the work of the Commission, had sent observers to the hearings, and that while they had seen no conclusive evidence actually linking adult magazines to crime, violence and child abuse, that they were concerned with "growing public consciousness" and had decided to "discontinue the sale of any adult magazines." Southland noted that "In view of our decision to modify our policy and withdraw these magazines, we urge that any reference to Southland or 7–Eleven be deleted from your final report." Time, Inc. described the "accusations" in the letter as "outrageous". That corporation's response went on to state, "We cannot believe the U.S. Department of Justice would lend its name to this slipshod and misguided effort." It referred to the possible harm to Time, Inc. if the report contained its name. Some replies also noted inaccuracies or erroneous "facts" in the Wildmon statement. *See* Ennis Declaration dated June 3, 1986, and Exhibit A attached thereto.

The plaintiffs contend that as a result of the letter and the "threat" that the names of the corporations would be published in the report, that many stores pulled Playboy and similar magazines from their shelves. *See* Ennis Declaration dated June 3, 1986. Indeed, plaintiffs allege that some stores have pulled magazines such as American Photographer, Cosmopolitan and Texas Monthly out of an abundance of caution. American Photographer contained a picture of bare-breasted woman, Cosmopolitan and Texas Monthly contained an advertisement for "Obsession" perfume which depicted a woman with one breast partially exposed.

The plaintiffs asked for injunctive relief to include (1) that the Commission send a notice withdrawing its letter, (2) that the Commission not include a listing of the corporations in its final report and (3) that the Commission send a letter stating that Playboy and perhaps the other publications are not obscene.

## II

In order to be entitled to injunctive relief, the plaintiffs must demonstrate that (1) they are likely to prevail on the merits, (2) they will suffer irreparable harm if injunctive relief is denied, (3) other persons would not suffer substantial injury if injunctive relief is granted, and (4) where lies the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 222, 559 F.2d 841, 843 (1977); *Virginia Petroleum Jobbers Association v. FPC,* 104 U.S.App. D.C. 106, 110, 259 F.2d 921, 925 (1958). Moreover, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *Washington Metropolitan Area Transit Commission,* 182 U.S.App. D.C. at 222, 559 F.2d at 843.

The Court considers first whether the plaintiffs have demonstrated that they are likely to prevail on the merits. In this connection, the parties are in agreement that the relevant, and perhaps controlling decision is *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). There, the Rhode Island legislature had established the "Rhode Island Commission to Encourage Morality in Youth". That Commission had established a practice of notifying distributors on official stationery that certain books and magazines were found to be "objectionable" for sale, distribution or display to youths under the age of 18. Notice of same would be sent to distributors, thanking them in advance for their cooperation and reminding them that the Commission had the duty to recommend prosecution for purveyors of "obscenity". A local police officer visited the distributors "shortly" after the distributor's receipt of the notice to determine what action the distributor had taken. The Supreme Court found that such activities of the Commission were unconstitutional and an abridgement to First Amendment liberties protected by the Fourteenth Amendment. The present plaintiffs make the same argument, but allege that their First Amendment rights are protected by the Fifth Amendment.

It hardly can be argued that the facts in *Bantam Books* and in the instant case are

not similar. The Supreme Court found that it was informal censorship even though the Rhode Island Commission argued that it was doing no more than advising distributors of their legal rights.

The Court noted that, "[i]t would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation independent of the law against obscenity. 372 U.S. at 68–69, 83 S.Ct. at 638 (citation and footnote omitted). The Supreme Court observed that, although the Commission was limited to "informal sanctions ... the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation ... the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." 372 U.S. at 67, 83 S.Ct. at 637 (footnote omitted). And, the Supreme Court made clear that "informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." 372 U.S. at 67, 83 S.Ct. at 638 (footnote omitted). Included as informal censorship were "listings or notifications of supposedly obscene or objectionable publications or motion pictures." 372 U.S. at 67, n. 8, 83 S.Ct. at 638, n. 8. Finally, the Court noted that the term "objectionable" was vague and left distributors to speculate whether the Commission considered a particular publication to be obscene or simply harmful to juvenile morality. 372 U.S. at 71, 83 S.Ct. at 640.

The above references to *Bantam Books* gives the flavor of that decision and is sufficient to demonstrate that serious constitutional questions have been raised in the instant cases. Indeed, a reading of the above case against the brief record in the instant cases suggests that we may be venturing along the same path, and this being so, further supports the arguments that the plaintiffs have demonstrated that they may succeed on the merits. An in depth consideration must, of course, await a final hearing on the merits. In considering this prong on the issue of injunctive relief, the Court need not determine that the plaintiffs *will* succeed, only that they *are likely* to succeed, and the "level" or "degree" of possibility of success will vary according to the other facts.

The letters in the instant case were vague, in the sense that they did not define "pornography." Indeed, at oral argument the defendants conceded that "pornography" was not their word; rather, it was the word of Reverend Wildmon. He does not define the word, and his written submission to the Commission demonstrates that he may very well equate "pornography" with "obscenity". Of even greater concern is the fact that the letter is based on the testimony of one witness, when approximately 200 witnesses appeared before the Commission. Finally, the letter does appear to contain an implied threat to the addressees. It refers to "testimony alleging that your company is involved in the sale or distribution of pornography" and states that the Commission's letter is giving an opportunity to the corporations to respond to the allegations "prior to [the Commission] drafting its final section on *identified distributors,*" and that if a company fails to respond that it will signal a "no objection" to be listed in the report as a distributor of pornography.

Turning to the issue of irreparable injury, the plaintiffs have presented affidavits and declarations through which they seek to demonstrate that they are suffering financial loss as the result of distributors refusing to sell their publications. This clearly applies to Playboy, for example, since a number of corporations no longer sell that magazine; Southland, for example. While the defendants argue that distributors voluntarily decided not to sell the magazine, it seems more than ironic that many of the decisions not to sell were made *after the Commission's letters were sent out.* Thus, there has been financial harm to the plaintiffs.

But, by far the most serious impact is with respect to the plaintiffs' First Amendment rights. It certainly can be ar-

gued, but the Court need not reach the issue at this time, that the effect of what the defendants have done amounts to a prior administrative restraint of material which even the defendants appear to concede is constitutionally protected matter. It is clear that something has occurred in the marketplace. A deprivation of a First Amendment right, that is a prior restraint on speech, a right so precious in this nation, constitutes irreparable injury. *Dombrowski v. Pfister*, 380 U.S. 479, 489, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965).

After weighing the above factors, the Court concludes that the plaintiffs have made a showing that they are likely to suffer irreparable injury.

### III

■ With respect to the other two prongs relating to injunctive relief, the Court notes that courts must be extremely cautious when weighing whether to grant injunctive relief against an executive or legislative committee, for any such action may do violence to the separation of powers. Moreover, "[t]he courts avoid use of extraordinary remedies that involve needless friction with a coordinate branch of the government." *Ansara v. Eastland*, 143 U.S.App.D.C. 29, 31, 442 F.2d 751, 753 (1971) (citations omitted). *See also Davis v. Ichord*, 143 U.S.App.D.C. 183, 442 F.2d 1207 (1970). Stated differently, "[j]udicial inquiry into the matter of legislative purpose must be undertaken with caution and great deference to the regularity of action by a coordinate branch of government." *Hentoff v. Ichord*, 318 F.Supp. 1175, 1181 (D.D.C.1970).

■ A relevant inquiry then concerns the mandate given to the Commission and whether the action of the Commission went beyond that mandate. The beginning point for the consideration of this inquiry must be the Commission's Charter, and in particular, Paragraph Two which sets forth the "Objectives and Scope of Activity" of the Commission. The Court has already set out the first paragraph of Paragraph Two which states the objectives of the Commis-

sion. The second paragraph of Paragraph Two sets forth the "scope" of activity and reads:

The scope of the Commission includes: a study of the dimensions of the problem of pornography, particularly visual and graphic pornography, including changes over the last several years in the nature of pornography, its volume, the impact of new technology, and pornography that relates to children; an examination of the means of production and distribution of pornographic materials, specifically including the role of organized crime in the pornography business; a review of the available empirical and scientific evidence on the relationship between exposure to pornographic materials and antisocial behavior, and on the impact of the creation and dissemination of both adult and child pornography upon children, including, as appropriate, the commissioning of new research on these subjects; a review of national, State, and local efforts, whether by the government or others, to curb pornography; and the exploration and, where appropriate, the recommendation of possible roles and initiatives that the Department of Justice and agencies of local, State, and Federal government could pursue in controlling, consistent with constitutional guarantees, the production and distribution of pornography.

When the Commission was directed to inquire and make "an examination of the means of production and distribution of pornographic materials", nothing in the charter suggested that the Commission was to publish lists of distributors, or seek to influence or persuade distributors not to sell so-called pornographic materials, or to recommend the prosecution of corporations or persons perceived to be distributors of pornography. Thus, the suggestion by the Commission that it will identify distributors of pornography goes beyond the Commission's mandate.

Even more questionable is what was to be gained by sending the letters. The transcript of the Commission meeting indicates

that some members were concerned about including Reverend Wildmon's testimony and statement in the final report and that some felt that the corporations identified by Reverend Wildmon as distributors of pornography should have an opportunity to respond to those allegations. But, the Commission did not identify Reverend Wildmon even though there was no reason for it not to do so because as the defendants argue, the hearings and the reports are public. Reverend Wildmon was not entitled to an informer's privilege. The letter was poorly framed because it does not define what is meant by pornography. At oral argument the defendants conceded that they had no definition in mind and only used the words used by Reverend Wildmon, but if the defendants had no clear definition in mind, then there is no way they could have expected realistic responses.

The letter then only appears to have two purposes. First, if no response was received, then the Commission might very well conclude that the statement by Reverend Wildmon as to the non-answering corporation was admitted. Second, the corporations that did not wish to be included in the report could advise the Commission that the magazines, those identified by Reverend Wildmon, and perhaps other magazines not so identified, would no longer be sold. This is exactly what Southland did. And, this was the result reached in *Bantam Books* when the Rhode Island Commission sent out its notices. A possible third response would be to merely state that the corporation did not sell or distribute pornography based upon the corporation's own definition of pornography, but such a response would undoubtedly raise a question as to whether or not it would be accepted by the Commission. The letter exceeded the objectives and scope of the Commission and the responses would not appear to lend anything to the work of the Commission. In short, the letter does not appear to be in furtherance of the work of the Commission. This being so, it can be argued that the only purpose served by that letter was to discourage distributors from selling the publications; a form of pressure amounting to an administrative restraint of the plaintiffs' First Amendment rights. Similar findings had led to the granting of injunctive relief against a legislative committee. *See Hentoff v. Ichord, supra.*

■ Finally, the Court notes that it is in the public interest to uphold a constitutionally guaranteed right.

■ In sum, the plaintiffs have demonstrated a likelihood of success on the merits and have also demonstrated that they will suffer irreparable injury if injunctive relief is not granted. Moreover, the defendants will not suffer substantial injury if injunctive relief is granted because the actions challenged by the plaintiffs are not necessary or relevant to the Commission's mandate. The granting of injunctive relief is in the public interest.

## IV

Having concluded that the plaintiffs are entitled to injunctive relief, the Court now turns to the task of determining the nature of the relief to be granted. The relief must take into consideration the First Amendment rights of the plaintiffs, but also must take into consideration the rights and obligations of the Commission consistent with its mandate and its obligation under the FACA. The Commission is required to conduct its business pursuant to the FACA. This means that the meetings are open to the public and that interested persons are invited to attend, appear before, or file statements before the Commission. 5 U.S.C.App. § 10(a)(1), (2) and, (3). The records, reports, transcripts, minutes, working papers, draft reports and similar documents are available to the public. 5 U.S.C.App. § 10(b). Thus, the testimony and statements of Reverend Wildmon like that of any other witness, are available to the public.

The plaintiffs do not seek to suppress the testimony of Reverend Wildmon or any other witness. What they do seek to avoid is an inclusion in the final report of a statement purporting to identify distributors of material which is alleged to be pornographic. While the defendants state that they do not now intend to publish such an identification in the final report, it is clear that the subject letter was designed to leave an impression that such a list would be included in the final report.

While the defendants have advised the Court that they will not publish the names of distributors of purported pornographic material in the final report, the record should be absolutely clear that they will not do so pending a final order in these

cases. It seems likely that for at least some of the distributors, the concern over having their names published in the Commission report compelled them to withdraw the sale and distribution of some of plaintiffs' magazines and books. That issue should be put to rest; accordingly, the Court will enter a preliminary injunction to prohibit such publication.

The Court stresses that the injunction relating to publication of names goes no further than that, and relates back to the defendants' threat to identify the distributors of purported pornographic material in the final report. This part of the injunction does no more than to incorporate in an order what the defendants have stated in open court.

Plaintiffs also request that the defendants be required to furnish the plaintiffs with the names of the corporations sent copies of the subject letter. The Commission is required to do so under the terms of the FACA. 5 U.S.C.App. § 10(b). That requirement will be incorporated in the order with a requirement that the defendants do so within five days of the date of the order.

Plaintiffs also seek to have the Court direct the defendants to send a letter to each corporation or person who was sent a copy of the original letter, withdrawing the original letter and advising the addressee that the Commission will not publish a listing in the final report. Plaintiffs have also asked the Court to require the Commission to disavow the original letter and to include a statement that the Commission does not consider Playboy to be obscene, or to be linked to rape, or sexual violence, or organized crime.

The Court will direct the Commission to send a letter to each addressee of the original letter advising them that the original letter has been withdrawn and that no reply is required. In this way, the failure to answer the original letter cannot be interpreted as an admission by the addressee that the addressee is or was a distributor of pornography. The letter shall also advise the corporations that their names will not be included in the final report as sellers or distributors of pornographic materials. With respect to the remaining requests made by the plaintiffs, those requests are denied since to grant those requests would inject the Court into the determination process of the Commission.

Defendants have argued against any injunctive relief on the grounds that enjoining the report itself would be contrary to the First Amendment. The Court need not address this issue since it does not enjoin the issuance of the report, in fact, based upon the representations made by the defendants in open court, the Court's order does not affect the final report to be entered by the Commission. The defendants also argue that the Court cannot review the recommendations of an Executive Branch Advisory Committee that are to be made to the Attorney General and in turn to the President. This Court has not done so in its order.

An appropriate Order consistent with this Memorandum has been entered.

## APPENDIX

Authorized Representative:

The Attorney General's Commission on Pornography has held six hearings across the United States during the past seven months on issues related to pornography. During the hearing in Los Angeles, in October 1985, the Commission received testimony alleging that your company is involved in the sale or distribution of pornography. The Commission has determined that it would be appropriate to allow your company an opportunity to respond to the allegations prior to drafting its final report section on identified distributors.

You will find a copy of the relevant testimony enclosed herewith. Please review the allegations and advise the Commission on or before March 3, 1986, if you disagree with the statements enclosed. Failure to respond will necessarily be accepted as an indication of no objection.

Please call Ms. Genny McSweeney, Attorney, at (202) 724-7837 if you have any questions.

Thank you for your assistance.

Truly yours,
s/Alan E. Sears
Alan E. Sears
Executive Director

enc: Self-Addressed
Postage Paid Mailing Label