PENTHOUSE INTERNATIONAL,
LTD., Appellant,

v.

Edwin A. MEESE, III, Attorney General
of the United States, et al.

No. 90–5181.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 15, 1991.

Decided July 19, 1991.

As Amended Aug. 27, 1991.

Rehearing and Rehearing En Banc
Denied Sept. 24, 1991.

Jeffrey H. Daichman, with whom Thomas V. Marino was on the brief, New York City, for appellant. Peter D. Isakoff, Washington, D.C., also entered an appearance for appellant.

John P. Schnitker, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Leonard Schaitman and Barbara L. Herwig, Attys., Dept. of Justice, were on the brief, Washington, D.C., for appellees.

Before SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge RANDOLPH.

SILBERMAN, Circuit Judge:

Appellant Penthouse International, Ltd. (Penthouse) brought this action against then Attorney General Edwin Meese, III and the members of the Attorney General's Commission on Pornography (Commission), seeking equitable and monetary relief for alleged violations of Penthouse's First Amendment rights. The district court granted appellees' motion for summary judgment, dismissing appellant's damages action as barred by qualified immunity and appellant's claims for declaratory and injunctive relief as moot. We affirm.

## I.

Concerned with what he perceived as a serious problem of pornography in American society, President Reagan requested that the Attorney General establish a commission to study the matter and advise the Department of Justice as to appropriate remedies. The Attorney General, accordingly, created the Commission on Pornography in 1985, pursuant to the Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2 §§ 1–15, "to determine the nature, extent, and impact on society of pornography in the United States, and to make specific recommendations to the Attorney General concerning more effective ways in which the spread of pornography could be contained, consistent with constitutional guarantees." The Commission took testimony from some 200 witnesses at a series

of six public hearings around the country, followed by a number of meetings, open to the public, at which Commission members reviewed the testimony, determined the contents, and discussed drafts of the Commission's final report.

One of the witnesses, Reverend Donald Wildmon, Executive Director of the National Federation of Decency, accused a number of well-known corporations of distributing pornography. Reverend Wildmon submitted a written statement entitled "Pornography in the Family Marketplace," setting forth his views about the role of corporations that were "household names" in selling pornographic films, television, and magazines. He asserted that the 7–Eleven national chain of convenience stores was "the leading retailer[ ]" of *Penthouse* and *Playboy,* which he termed "porn magazines," and predicted that the withdrawal of this major sales outlet would financially "cripple" both magazines. After discussion whether to include Reverend Wildmon's testimony in the report, the Commission decided to send a letter to the corporations named by Reverend Wildmon, asking for a response to the accusation. The letter, dated February 11, 1986, which was sent to 23 corporations, included a copy of Reverend Wildmon's testimony, but failed to identify him as its author. The letter stated:

Authorized Representative:

The Attorney General's Commission on Pornography has held six hearings across the United States during the past seven months on issues related to pornography. During the hearing in Los Angeles, in October 1985, the Commission received testimony alleging that your company is involved in the sale or distribution of pornography. The Commission has determined that it would be appropriate to allow your company an opportunity to respond to the allegations prior to drafting its final report section on identified distributors.

You will find a copy of the relevant testimony enclosed herewith. Please review the allegations and advise the Commission on or before March 3, 1986, if you disagree with the statements enclosed. Failure to respond will necessarily be accepted as an indication of no objection. Please call Ms. Genny McSweeney, Attorney, at (202) 724–7837 if you have any questions.

Thank you for your assistance.

    Truly yours,

    s/Alan E. Sears

    Alan E. Sears

    Executive Director

enc.: Self–Addressed

    Postage Paid Mailing Label

The response varied. Time Inc. called the "accusations" "outrageous" and chastised the Commission for relying on "uncorroborated, gratuitous statements" from unidentified sources in what it characterized as a "slipshod and misguided effort." Southland Corporation, owner of the 7–Eleven chain, on the other hand, wrote that since the corporation had decided to stop selling adult magazines in light of the public concern about the effects of pornography it "urge[d] that any references to Southland or 7–Eleven be deleted from [the Commission's] final report."

Southland's decision, Penthouse alleges, was influenced by a telephone call from one of the members of the Commission to the General Counsel and Vice President of Southland, John H. Rodgers.[1] Rodgers declined to identify the Commission member with whom he spoke, but alleged that he or she told him that the Commission believed that *Playboy* and similar magazines were linked to child abuse and the Commission intended to publish this finding in its report. Southland, which had been leading a national campaign to fight child abuse, believed that if the Commission published those views on the connection between magazines sold by Southland and child abuse, the resulting publicity would be embarrassing to Southland, whether or not there was in fact such a link. Penthouse alleges that the Commission member's information was false in two respects—the

---

1. Penthouse relies on the affirmation of Bruce Ennis, counsel for Playboy, made in opposition to the grant of summary judgment in the Playboy litigation, in support of these allegations.

Commission had found no causal connection between *Playboy* or other such magazines and child abuse, and it had no intention of discussing any such link in its report. Penthouse also claims that the Commission member deliberately spread these allegedly false allegations to Southland with the intention of inducing the company to withdraw as a distributor of *Penthouse*.

Playboy Enterprises, Inc. and Penthouse sought a preliminary injunction against publication of any "blacklist" of corporations which distributed their respective publications and an order withdrawing the Commission's letter, as well as other relief, including a statement from the Commission that it did *not* view their magazines as obscene. The district court granted preliminary relief. *See Playboy Enters. v. Meese*, 639 F.Supp. 581 (D.D.C.1986). The court determined that Playboy had shown that it was likely to prevail on the merits in establishing that the Commission's actions amounted to an informal scheme of government censorship constituting a prior administrative restraint. The court therefore granted a preliminary injunction, requiring the Commission to send a follow-up letter to the named corporations, withdrawing the first letter and stating that no reply to it would be necessary as the Commission had already decided that no corporations would be named in the final report. The Commission complied. The court refused, however, to be drawn further into the dispute—by considering whether or not the publications were obscene or pornographic or preventing the Commission from doing so—and therefore refused further injunctive relief.

The two publications persisted in their claims for permanent injunctive and declaratory relief, as well as with a *Bivens* claim for damages, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Defendants at that point moved for summary judgment asserting the claims for equitable relief were moot and that the damages claim was barred by the doctrine of good faith or qualified immunity because the Commission's action did not violate any clearly-established First

Amendment right. Plaintiffs contended that defendants' conduct is unconstitutional under the principle established in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), and alternatively argued that summary judgment was improper before plaintiffs had the opportunity for discovery regarding defendants' allegedly "unconstitutional motives," to demonstrate that defendants acted with the intent to violate plaintiffs' constitutional rights. Discovery was also necessary, in plaintiffs' view, to resolve the material dispute as to the continuing harm from defendants' letter. The district court granted summary judgment to defendants on all grounds. Penthouse alone appeals the judgment.

## II.

■ Appellant, of course, wishes a determination from the judiciary that the government's conduct was unlawful. Such an opinion, appellant believes, will enable it to persuade retailers who have discontinued selling *Penthouse* to change their minds, and prevent a similar effort in the future which might threaten appellant's circulation. Appellant's primary claim, designed to gain such a determination, is its *Bivens* claim for damages. It is asserted that the Commission sought to prevent ("chill") the distribution of constitutionally protected speech and thereby violated appellant's First Amendment rights. The government has no right to prohibit adult pornography that does not qualify as obscenity, and, in any event, the government may not impose a prior restraint on the distribution even of arguably obscene materials.

Penthouse, as we mentioned, relies on *Bantam Books* to support its claim. In that case, however, the Rhode Island Commission to Encourage Morality in Youth had the authority "to investigate and *recommend the prosecution* of all violations" of state statute. 372 U.S. at 60 n. 1, 83 S.Ct. at 633 n. 1 (emphasis added). The notices sent by the Rhode Island Commission specifically stated that the Commission was charged by the state legislature with

"prevent[ing] the sale, distribution or display of indecent and obscene publications," and that copies of the lists of "objectionable" publications were being circulated to "Chiefs of Police" "with the order that they are not to be sold, distributed or displayed to youths under eighteen years of age." *Id.* at 62 n. 5, 83 S.Ct. at 635 n. 5. Moreover, the notice informed the recipient that "[t]he Attorney General will act for us in case of non-compliance." *Id.* And the notice was followed by a police visit to the distributors targeted by the Rhode Island Commission. Because the Commission viewed its task as the *proscribing* of objectionable publications—it phrased its notices as orders and followed them up by police visit—the Court thought the plaintiff faced a genuine threat of prosecution and therefore the Commission's enforcement scheme amounted to a prior administrative restraint on publication. *Id.* at 67–72, 83 S.Ct. at 637–640.

In our case, the Advisory Commission had no equivalent tie to prosecutorial power nor authority to censor publications. The letter it sent contained no threat to prosecute, nor intimation of intent to proscribe the distribution of the publications. Penthouse argues that since the letter was written on Justice Department stationery, used the term "allegations," and contained an instruction to contact an attorney for further information, recipients would reasonably think they were threatened with prosecution—particularly in light of the potential confusion between the terms pornography and obscenity. Indeed, as Penthouse points out, several recipients responded by denying they had engaged in unlawful conduct. It may well be that the Commission came close to implying more authority than it either had or explicitly claimed. Nevertheless—any misapprehensions of recipients notwithstanding—we

do not believe that the Commission ever threatened to use the coercive power of the state against recipients of the letter. *Cf. Meese v. Keene,* 481 U.S. 465, 484, 107 S.Ct. 1862, 1873, 95 L.Ed.2d 415 (1987) (recipient's perception of the negative connotations of the government's use of a term does not itself cause the government's speech to amount to censorship). And the Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction. *See id.* at 480–83, 107 S.Ct. at 1870–72 (1987); *Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972) (First Amendment violations found when "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature"); *see also Lamont v. Postmaster General,* 381 U.S. 301, 305, 85 S.Ct. 1493, 1495, 14 L.Ed.2d 398 (1965).[2]

■ Appellant, employing a number of forceful verbs and adjectives, would have us extend *Bantam Books.* It is argued that the Commission's action "chilled," "intimidated," "condemned," and "censored" distribution of *Penthouse;* the very fact that the 7–Eleven chain discontinued sales of *Penthouse* proves that the Commission's actions abridged appellant's First Amendment rights. That argument seems to us to stretch too far. We do not see why government officials may not vigorously criticize a publication for any reason they wish. As part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate. *Cf. Reuber v. United States,* 750 F.2d 1039, 1059 (D.C.Cir.1984) (a government actor may

---

**2.** Appellant also relies on *NAACP v. Alabama,* 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958), as forbidding "blacklisting" distributors of appellant's magazine. But *NAACP v. Alabama* implicated a separate interest—that against compelled disclosure as an infringement of the First Amendment guarantee of privacy of association and belief—which appellant does not allege to be at issue in this case. Since there

is no contention that the anonymity of the distributors of appellant's magazine is at stake (nor do we see how it could be), the line of associational cases is simply inapposite. *Cf. Uphaus v. Wyman,* 360 U.S. 72, 81, 79 S.Ct. 1040, 1046, 3 L.Ed.2d 1090 (1959) (where list is already publicly available, First Amendment privacy interest is slight).

openly criticize a study produced by an employee so long as no job-threatening sanction is employed). If the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized. *See Block v. Meese,* 793 F.2d 1303, 1312–1314 (D.C.Cir.1986) (Scalia, J.); *cf. Barr v. Mateo,* 360 U.S. 564, 574–75, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959); *see generally* M. Yudof, *When Government Speaks,* 20–22, 31, 38–44, 55–56, 164–73, 200–07, 259–99 (1983); T. Emerson, *The System of Freedom of Expression,* 698–99, 701–09 (1970).

Whenever a government official criticizes a publication it might be thought that he or she implicitly appeals to the public not to buy, or distributors not to sell, that publication. And if the distributor refuses the appeal and the government official criticizes the distributor for its refusal, it is hard to understand how, and why, that criticism can be banned. The letter, of course, did not go so far as to express the government's (or even the Advisory Commission's) criticism of the companies selling *Penthouse.* But even accepting Penthouse's argument that the letter could be fairly read as a threat to "blacklist" its distributors, this charge with the rhetoric drawn out says nothing more than that the Commission threatened to embarrass the distributors publicly. As we have observed, corporations and other institutions are criticized by government officials for all sorts of conduct that might well be perfectly legal, including speech protected by the First Amendment. At least when the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights.[3] "[W]e know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content." *Block v. Meese,* 793 F.2d at 1313.

In any event, it is unnecessary to decide whether a government official's appeal to a distributor not to sell a particular publication, backed by no more than a "threat" by the official to characterize the publications with a strong pejorative, could, under any circumstances, violate the First Amendment. Even if it could, and even if the facts of this case were to make out such a cause of action, certainly no court has ever so held. To be sure, in *Hobson v. Wilson,* we held that the extensive scheme developed by the FBI to disrupt political activities of certain disfavored groups (COINTELPRO) violated their First Amendment rights of association and speech, 737 F.2d 1, 28 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). In that case, however, FBI agents acted surreptitiously and in disguise to publish pamphlets making false allegations about persons in the target organizations. The government officers were not openly criticizing anyone or any idea; indeed, they were acting as agents provocateurs without disclosing that the government was involved at all. We see *Hobson,* then, as an exception to the general rule we glean from Supreme Court cases, an exception limited to a situation where the government's interest in having its officials able to communicate freely on all sorts of matters is not implicated. That exception does not apply here because there is no allegation that a Commission member said or did anything while purporting to be other than a Commission member. That Southland's general counsel did not identify *which* Commission member made the alleged call seems quite irrelevant. Some of the broad dicta in *Hobson* used in identifying the contours of the constitutional right involved appears to us to have been overtaken and circumscribed by the subsequent Supreme Court case of *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987), which cautioned against describing the asserted constitutional right in overly general

---

**3.** There is no contention that the threat to blacklist the distributors violated their due process rights. *Cf. Joint Anti–Fascist Refugee Comm. v.*

*McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

terms. In sum, appellees are entitled to immunity from suit for damages for a constitutional tort because "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly* established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added); *see also Harris v. District of Columbia*, 932 F.2d 10, 12–13 (D.C.Cir.1991).

■ For that same reason, appellant's procedural argument—that summary judgment was improperly granted against it before it had an opportunity to pursue discovery concerning the Commission's intent—also fails. Assuming *arguendo* that appellant could show that the Commission members and staff, and even Justice Department employees, deliberately set out to so embarrass or intimidate all Penthouse's distributors to bring about a substantial reduction in the magazine's circulation, we do not see how appellant can recover damages—so long as these officials took no covert, disruptive action, but identified themselves and their speech. Even with those additional facts, it cannot reasonably be said that appellant had a *clearly* established constitutional right to be free of such deliberate and calculated pressure if no threats of legal sanctions were employed. Appellant's reliance on *Hobson* to argue that if the government's motive is to "counter the influence of the target associations," 737 F.2d at 27, there is an "additional basis of liability ... regardless of whether the law was clearly established," Appellant Br. at 41, is unavailing. Discovery into motive is permissible only when the alleged substantial constitutional violation "turns on an unconstitutional motive," *Siegert v. Gilley*, 895 F.2d 797, 802 (D.C. Cir.1990), *aff'd on other grounds*, —— U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (U.S. 1991). By "turning" on motive, we understand *Hobson* to mean that the alleged conduct, like a discharge of a government employee who was a minority, is not of constitutional concern—indeed it might not even be blameworthy—unless it is alleged that a government official fired the employee because of the employee's minority status. In other words, the act and motive are analytically quite separate and it is only when both coalesce that a constitutional tort occurs. And the motive is not expressed in terms of interference with someone's "constitutional right," which is much too general and vague but rather a more particular motive like firing someone because of his or her skin color which, when combined with the act, as a matter of law constitutes an interference with a constitutional right. Here, by contrast, the government's "motive" is not analytically a separate factor. Nor could it be. One must assume, as we have indicated above, that the government's speech was designed, or intended, or motivated, to discourage the distribution of *Penthouse*. The actor always can be thought to intend the natural consequences of his act. To ask, therefore, whether the government intended to interfere with appellant's free speech or First Amendment protected interests is to beg the question because all depends on how one defines the First Amendment protected interest. The proper question is whether the appellant enjoys a constitutional right to be free of government criticism that would discourage the distribution of its magazine. If it does not—or at least if the right is not clearly established—the government's motive is irrelevant.

Nor do we believe that the truth or falsity of the statements included in the Commissioner's alleged phone call to Southland's general counsel is a basis for a constitutional tort. One of the purported assertions—that pornography causes child abuse—is not the kind of statement that appears susceptible to a true/false evaluation, and the second—that the Commission would make such a link in its report—appears to be only a prediction. In any event, we very much doubt that a *constitutional* line could or should be drawn between "true" government speech that impacts on the publications or speech of private citizens and "false" government speech of that character.

■ Appellant also contends that the members of the Commission are not entitled to immunity because the letter suggesting that the Commission might publish a list of distributors in its final report was outside their legitimate investigative mandate. We think this argument without merit. The Commission's charter, which defined the scope of the Commission's inquiry, called for the Commission to make "an examination of the means of production and distribution of pornographic materials" and "the recommendation of possible roles and initiatives that the Department of Justice and agencies of local, State, and Federal government could pursue in controlling, consistent with constitutional guarantees, the production and distribution of pornography." Given this charter, it could hardly be said that a letter inquiring (however clumsily) into the distribution of pornography is " 'manifestly or palpably beyond the authority [of the Commission].' " *Briggs v. Goodwin*, 569 F.2d 10, 16 (D.C.Cir.1977), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) (quoting *Spaulding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)).

### III.

■ Although Penthouse does not appeal the district court's holding that its claim for a permanent injunction is moot because Penthouse cannot show that it will ever "again be subject to the alleged illegality," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983), it nevertheless renews its request for a declaratory judgment. Article III case or controversy requirements apply as forcefully, of course, to relief sought under the Declaratory Judgment Act as to any other form of relief. *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). The question for us, then, is whether at the time relief is sought " 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*' " *Preiser v. Newkirk*, 422 U.S. 395,

402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (emphasis by the Court) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

The district court's issuance of a temporary injunction sufficiently responded to the injury for which Penthouse sought equitable relief in its original complaint to raise a real question whether any dispute still remains for the court to adjudicate. When a litigant has already received relief for the injury complained of, no live controversy remains. *See Save Our Cumberland Mountains v. Clark*, 725 F.2d 1422, 1432 (D.C.Cir.1984). To be sure, the district court's preliminary injunction issued only on behalf of Playboy International Enterprises, and did not specifically refer to Penthouse because Penthouse chose to seek discovery and therefore refused consolidation with Playboy's suit. Penthouse, nevertheless, obtained the equitable relief it was seeking—the letter to which it objected was withdrawn and the Commission's *final* report was published without listing the distributors of appellant's magazine as "distributors of pornography."

Penthouse relies on *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), to support its argument that the controversy is still alive. *County of Los Angeles* held that a case is moot only when "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur ... and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *id.* at 631, 99 S.Ct. at 1383 (citations omitted). Since the Commission's dissolution ensures that the violation will not recur, Penthouse rests its argument against mootness on the second part of the test. It asserts that it continues to suffer "considerable reputational and financial injury," because distributors who dropped its magazine in response to the Commission's letter are still refusing to carry the magazine, despite the retraction of the letter by the Commission. Penthouse argues that a declaratory judgment that the Commission's action violated

Penthouse's First Amendment rights will mitigate this continuing harmful effect by "help[ing to] allay the concerns of distributors who fear that association with plaintiff's publication may subject them to governmental condemnation or possibly even prosecution."

■ We are skeptical whether this claimed continuing injury is adequate to keep the controversy alive under *County of Los Angeles.* In all the cases in which this court, (in line with Supreme Court precedent, *see, e.g., Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984)), has found that the effects of an alleged injury were not eradicated, some tangible, concrete effect, traceable to the injury, and curable by the relief demanded, clearly remained. For example, in *Reeve Aleutian Airways v. United States,* 889 F.2d 1139, 1143 (D.C.Cir.1989), the reputational injury was a direct effect of the legal action the government had taken in suspending the company from participating in Department of Defense contracts. Even though the suspension had been lifted, it remained on the books as evidencing a violation of air safety standards, causing a drop in the company's business. In *American Fed. of Gov't Employees v. Reagan,* 870 F.2d 723, 726 (D.C.Cir.1989), although a newly-issued executive order had superseded the allegedly defective original order, "[i]mportant collateral consequences flowing from the [original] order" kept the controversy alive. There remained an unfair labor practice suit regarding the action the union had taken in unilaterally dropping the parties affected by the original order from membership as a direct response to that original order. And in *Doe v. United States Air Force,* 812 F.2d 738, 740–41 (D.C.Cir.1987), the effect of the government's allegedly illegal search was not completely eradicated because the government retained a copy of the records seized, even though it did not intend to use them, and a declaratory judgment would afford the tangible relief of the return of the disputed documents. The continuing harm of which Penthouse complains appears to fall short of this type of showing. Penthouse claims that distributors are fearful of prosecution for carrying the magazine. While a controversy is not moot so long as a real danger of prosecution remains, a mere speculative or remote chance of legal action will not suffice. *Clarke v. United States,* 915 F.2d 699, 701–02 (D.C.Cir.1990) (en banc).

Nor is the claim that distributors fear future government condemnation less speculative. Even if we assume that the Commission's letter was intended to show its disapproval of distributors of pornography (including distributors of *Penthouse* magazine), Penthouse offers no evidence that *any* governmental body continues to wage a campaign to discourage its distributors. So there is no ongoing threat that can account for the distributors' alleged fear of government disapproval. As to the argument that the distributors' fear is a continuing effect of the Commission's original action, Penthouse offers no reason why, if the retraction of the letter and the demise of the Commission itself failed to persuade distributors to return once again to the Penthouse fold, a declaratory judgment would be likely to do so. Appellant has not shown, therefore, that even were it to prevail on the merits, the declaratory relief which it now seeks would actually redress the reputational and business injuries from which it claims to be suffering. It seems highly speculative that any action short of requiring the distributors to carry *Penthouse* would give appellant relief.

■ Even assuming that there is some trace of a continuing injury sufficient to satisfy Article III, we still must determine whether declaratory relief would be appropriate as an exercise of the court's discretionary, equitable powers. Where it is so unlikely that the court's grant of declaratory judgment will actually relieve the injury, the doctrine of prudential mootness—a facet of equity—comes into play. This concept is concerned, not with the court's power under Article III to provide relief, but with the court's discretion in exercising that power. *See Chamber of Commerce v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). Declaratory relief, like other forms of equitable relief, is dis-

cretionary. *A.L. Mechling Barge Lines v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961). The Declaratory Judgment Act states only that a court *"may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (1988) (emphasis added). Where it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers. *See In re AOV Indus.,* 792 F.2d 1140, 1147–48 (D.C.Cir.1986); *Spivey v. Barry,* 665 F.2d 1222, 1235 (D.C.Cir. 1981). *See also Eccles v. Peoples Bank,* 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948). This is especially true where the court can avoid the premature adjudication of constitutional issues. *See Community for Creative Non-Violence v. Hess,* 745 F.2d 697, 701 (D.C.Cir.1984). Here we are faced with a constitutional issue of first impression—the scope of the government's right to speak where the government's speech discourages the constitutionally-protected speech of private citizens. The Supreme Court has signalled its reluctance to decide this very question, *see Meese v. Keene,* 481 U.S. at 484, 107 S.Ct. at 1873, while pointing to the troubling implications of limiting the government's free speech rights, *see id.* at 484 n. 18, 107 S.Ct. at 1873 n. 18. We should wait to decide this issue until it is squarely presented. We therefore affirm the district court's denial of Penthouse's request for a declaratory judgment.

\* \* \* \* \* \*

For the foregoing reasons, the district court's grant of summary judgment is affirmed.

*It is so ordered.*

RANDOLPH, Circuit Judge, concurring:

I join in part III of the court's opinion affirming the district court's denial of declaratory relief, but concur only in the court's judgment that defendants are immune from liability. Plaintiffs have alleged that one Commissioner, in a telephone call to an official of Southland Cor-

poration, conveyed a false statement about the Commission's findings for the purpose of inducing Southland to stop distributing *Penthouse* magazine. Although part II of the court's opinion suggests otherwise, I believe the First Amendment may well prohibit government officials from spreading false, derogatory information in order to interfere with a publisher's distribution of protected material. While this might require an inquiry into the official's motive, it is not unusual for a First Amendment violation to turn on whether governmental conduct was undertaken for the purpose of infringing on someone's speech. *See Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1974). I also do not think there would be any particular difficulty in drawing a line between cases in which an official has spoken the truth or perhaps made an inadvertent misstatement (*cf. Babbitt v. United Farm Workers,* 442 U.S. 289, 301, 99 S.Ct. 2301, 2310, 60 L.Ed.2d 895 (1979)) and cases in which the official has engaged in intentional lying in order to bring about the injury. A ruling along these lines would, however, constitute new law. Like the majority, I cannot find any clearly established doctrine that the sort of governmental interference alleged here, which is analogous to the common law tort of "injurious falsehood" or malicious interference with a contractual relationship (*see* 2 F. HARPER, F. JAMES & O. GRAY, THE LAW OF TORTS 297 (1986); RESTATEMENT (SECOND) OF TORTS § 767 (1979)), violates the First Amendment. I therefore concur in the judgment that the defendants are immune from liability under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).